**IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF PENNSYLVANIA**

| | |
|---|---|
| Ousmane SOUMARE, M.P.B, and Lassana DIANIFABA, on their own behalf and behalf of others similarly-situated, <br><br>                  Plaintiffs, <br>    v. <br><br> John E. RIFE, <br>      in his official capacity as Acting Field Office Director, Philadelphia Field Office, Enforcement and Removal Operations, U.S. Immigration and Customs Enforcement; <br><br> Markwayne MULLIN, <br>      in his official capacity as Secretary, U.S. Department of Homeland Security; and <br><br>  David J. VENTURELLA, <br>      Acting Director of United States Immigration and Customs Enforcement, acting in their official capacities; <br><br> U.S. DEPARTMENT OF HOMELAND SECURITY; U.S. IMMIGRATION AND CUSTOMS ENFORCEMENT, <br><br>                 Defendants. | ELECTRONICALLY FILED <br><br><br> Case No. _____ <br><br><br> Related to *Soumare v. Jamison*, No. 2:25-cv-06490 (Judge Henry) |

**CLASS ACTION COMPLAINT**

**TABLE OF CONTENTS**

CLASS ACTION COMPLAINT ........................................................................................ 1

I.    INTRODUCTION ................................................................................................ 1

II.   JURISDICTION AND VENUE .......................................................................... 6

III.  PARTIES ............................................................................................................. 6

IV.   STATUTORY, REGULATORY, AND CONSTITUTIONAL LAW
      GOVERNING DHS RE-ARRESTS AND RE-DETENTIONS ...................................... 10

      A.    Immigration Detention and Release Provisions ...................................... 10

      B.    Re-Arrest and Re-Detention of Non-Citizens ......................................... 13

V.    FACTUAL BACKGROUND ............................................................................. 18

      C.    For decades, the Philadelphia Field Office required a material change in
            circumstances before re-arresting and re-detaining previously
            released people. ...................................................................................... 18

      D.    In the middle of 2025, the Philadelphia ICE Field Office rescinded its
            Changed Circumstances Policy, thus permitting re-detentions despite no
            change in circumstances ......................................................................... 22

            1.    Re-detentions despite no change in circumstances have also occurred
                  elsewhere ...................................................................................... 25

            2.    The Philadelphia ICE Field Office's Rescission of the Changed
                  Circumstances Policy unfolded amid a nationwide push to
                  increase arrests and detentions. .................................................... 26

      E.    Plaintiffs and members of the proposed Class and Sub-Class who pose no flight
            risk or danger to the community now face re-detention following the unlawful
            Rescission of the Changed Circumstances Policy ................................... 29

      F.    The Philadelphia Field Office has offered no reasoned explanation for its dramatic
            change in policy ...................................................................................... 40

            1.    The Government's Reinterpretation of 8 U.S.C. § 1225(b)(2) ................. 42

      G.    The drastic consequences of the Philadelphia ICE Field Office's
            Rescission of the Changed Circumstances Policy impose extraordinary and
            irreparable harm on Plaintiffs and the proposed class members ........................ 45

VI.   CLASS ACTION ALLEGATIONS ................................................................... 53

VII.    CLAIMS FOR RELIEF ............................................................................................... 55

VIII.    PRAYER FOR RELIEF ............................................................................................... 58

## I.    INTRODUCTION

1.    This class action challenges the rescission of a longstanding policy of the Immigration and Customs Enforcement's (ICE) Philadelphia Field Office that prohibited officers from re-arresting and re-detaining people previously released from immigration custody absent a material change in circumstances justifying re-detention.

2.    This longstanding policy, the "Changed Circumstances Policy," required officers to justify re-arrest and re-detention by first making an individualized determination of a material change in circumstances such that a person now poses a danger to the community or would be a flight risk. This policy comported not only with DHS's statutory and regulatory scheme and national DHS policy and practice, but also with a fundamental due process principle: When the government conditionally releases an individual, it makes an "an implicit promise" that their liberty will not be revoked unless they fail to satisfy their conditions of release. *See Morrissey v. Brewer*, 408 U.S. 471, 482 (1972). It also conformed with the Fourth Amendment's prohibition on repeated seizures based on the same probable cause without a material change in circumstances. *See United States v. Holmes*, 452 F.2d 249, 261 (7th Cir. 1971) (Stevens, J.).

3.    People, including the named Plaintiffs, have relied on the Changed Circumstances Policy. Under the policy, they were able to pursue their immigration cases without fear of arbitrary arrest. They took care of their families, held down jobs that contributed to their families and communities pursuant to lawful work authorization, paid taxes, invested in their own education and the education of their children, and contributed to the communities where they lived. For more than 40 years, people who had been released from detention while in removal proceedings expected, based on that policy, that they would not be re-detained absent an individualized determination of a material change in circumstances that indicates new danger or flight risk.

4.      This all changed in 2025, after the Department of Homeland Security (DHS) and ICE nationally made it clear they wanted more arrests regardless of people's individualized circumstances. In response, in the middle of 2025, the Philadelphia ICE Field Office rescinded its longstanding policy and began re-arresting and re-detaining people previously determined to pose no risk of flight or danger to the community and still in full compliance with all conditions of their release, without making an individualized finding of changed circumstances (the "Rescission").

5.      These re-arrests and re-detentions occur both at required check-ins with ICE, including through the Intensive Supervision Appearance Program (ISAP), and wherever ICE officers encounter previously released people within the reach of the Philadelphia ICE Field Office, whose area of responsibility includes Pennsylvania, Delaware, and West Virginia.

6.      The concrete consequences of the Philadelphia ICE Field Office's unlawful Rescission of the Changed Circumstances Policy are horrendous: children are separated from their parents, spouses are left frantically searching for their loved ones in a sprawling national web of ICE detention centers, detained people with chronic medical conditions are deprived of their medication, and businesses are disrupted by sudden and unexplained staff shortages. By sending people to remote detention centers far from their homes, the Philadelphia ICE Field Office's Rescission of the Changed Circumstances Policy has also hobbled their access to counsel and ability to pursue eligible claims for relief. And it has spread fear and anxiety among people who intend to comply with their legal obligations to appear for court hearings and supervision check-ins but who now worry that in doing so, they risk re-arrest and re-detention.

7.      The Rescission of the Changed Circumstances Policy is unlawful. It reverses longstanding agency policy without reasoned explanation or consideration of the reliance interests of those who are now subject to sudden re-arrest and re-detention; it permits ICE agents to violate

fundamental due process guarantees under the Fifth Amendment that demand an individualized determination of flight risk and danger to the community before subjecting a person to rearrest or re-detention; and it permits ICE agents to violate the Fourth Amendment's prohibition on unreasonable seizures. Further, it cannot be squared with limits on Defendants' statutory authority to arrest and detain people under the Immigration and Nationality Act. The Philadelphia ICE Field Office's Rescission of the Changed Circumstances Policy is therefore contrary to law and arbitrary and capricious in violation of the Administrative Procedure Act (APA).

8. Plaintiffs challenge the Philadelphia ICE Field Office's Rescission of the Changed Circumstances Policy. But Philadelphia is not the first ICE field office to face legal scrutiny over re-detaining people despite no material changes in their circumstances. The United States District Court for the Northern District of California examined the San Francisco ICE Field Office's arrest practices and found that its policy of re-arresting and re-detaining people despite no material change in their circumstances likely violates the APA, ordering that the policy be stayed pending final judgment in that case. *See Garro Pinchi v. Noem*, 813 F. Supp. 3d 973, 1037–38 (N.D. Cal. 2025).

9. The Philadelphia ICE Field Office's Rescission of its Changed Circumstances Policy occurred amidst sweeping changes by DHS and ICE to expand ICE detention and drastically expand who is subject to mandatory immigration detention. Around the country and in Pennsylvania, ICE expanded their capacity to detain people through new or expanded contracts with county jails, Bureau of Prisons facilities, and new detention centers. At the same time, a July 2025 DHS Memo abruptly changed the government's decades-old interpretation of an immigration detention statute at 8 U.S.C. § 1225(b)(2), applying it for the first time to people arrested in the interior of the United States—irrespective of how long a person has resided in the U.S. and that

3

they are not currently "seeking admission," as the statutory text requires. But that July 2025 DHS Memo was clear that it did not mandate the re-detention of people previously released.

10.    The drastic reinterpretation of 8 U.S.C. § 1225(b)(2) led to a deluge of immigration habeas petitions. And while the issue makes its way through the various Courts of Appeals, the surge of habeas petitions continues because most petitioners who have brought individual habeas challenges to their detention under § 1225(b)(2) are winning. Indeed, courts in this District and around the country have overwhelmingly rejected this new statutory interpretation of 8 U.S.C. § 1225(b), including in cases of people previously arrested and released. *See e.g.*, *Ndiaye v. J.L. Jamison, et al.*, No. CV 25-6007, 2026 WL 373247, at \*7 (E.D. Pa. Feb. 10, 2026) (granting petition and listing cases from this district who ruled similarly); Order at 1 n. 2, *Faria Jimenez v. Jamison*, No. 2:26-cv-03083 (E.D. Pa. May 12, 2026) (granting direct release on statutory and due process grounds that petitioner's detention under 8 U.S.C. § 1225(b)(2) was not lawful, noting that petitioner was re-detained despite no material change in circumstances, and that his "[h]is record of compliance with his release conditions speaks for itself."). *See also* Kyle Cheney & Jessie Blaeser, *Explore the data: More than 13,600 rulings against Trump in ICE cases*, Politico (May 13, 2026; updated June 16, 2026), https://www.politico.com/news/2026/05/13/mandatory-detention-ice-cases-rulings-database-00913988?_sp_pass_consent=true compiling over 15,500 immigration habeas corpus decisions from between July 7, 2025 and June 16, 2026, and reporting that judges across the country have ruled against the government's reinterpretation of 1225(b)(2) in at least 9,101 cases).

11.    Most circuit courts confronted with the government's novel statutory interpretation of § 1225(b)(2) have likewise rejected it. *See Barbosa da Cunha v. Freden*, 175 F.4th 61, 70 (2d Cir. 2026); *Hernandez Alvarez v. Warden, Fed. Det. Ctr. Miami*, 175 F.4th 1258, 1262 (11th Cir.

4

2026); *Lopez-Campos v. Raycraft,* 175 F.4th 713, 732 (6th Cir. 2026); *see also Castañon-Nava v. U.S. Dept. of Homeland Sec.*, 175 F.4th 828 (7th Cir. 2026) (discussing but offering no controlling opinion). *But see Buenrostro-Mendez v. Bondi*, 166 F.4th 494 (5th Cir. 2026); *Avila v. Bondi*, 170 F.4th 1128 (8th Cir. 2026). The question is also currently before the Third Circuit. *Buele Morocho v. Warden Philadelphia FDC*, No. 26-1150 (3rd Cir. 2026) (argued May 11, 2026).

12.     While the question of the scope of § 1225(b)(2) is undoubtedly an important one to be answered, this class action under the Administrative Procedures Act (APA) asks the Court to answer a different question. The named Plaintiffs, on behalf of a class and sub-class of similarly situated people, ask the Court to find that the Defendants violated the Administrative Procedure Act after the Philadelphia ICE Field Office unlawfully rescinded the Changed Circumstances Policy. That final agency action has paved the way for ICE officers within the Philadelphia ICE Field Office to re-arrest and re-detain people despite no material change in their circumstances. This legal challenge, focused on the Philadelphia ICE Field Office's Rescission of the Changed Circumstances Policy, is independent of the statutory authority Defendants might invoke to justify a person's re-detention. Indeed, before it was rescinded, the Changed Circumstances Policy had applied to all proposed class members, regardless of the statute under which they were detained.

13.     The named Plaintiffs Ousmane Soumare, M.P.B, and Lassana Dianifaba, on behalf of the proposed Class and Plaintiffs M.P.B. and Lassana Dianifaba, on behalf of the Subclass, bring this APA challenge on behalf of people who have been or will be harmed by the Rescission of the Changed Circumstances Policy. The proposed Class is defined as: (1) all noncitizens subject to re-arrest or re-detention by the Philadelphia ICE Field Office; (2) who have been or will be released from DHS custody; (3) are in removal proceedings under 8 U.S.C § 1229a, including any § 1229a proceedings that have been dismissed where the dismissal is not administratively final;

and (4) are not subject to detention under 8 U.S.C. §1226(c) (the "Class"). The proposed Subclass includes all members of the Class whose initial release from DHS custody was or will be on bond, conditional parole, or on their own recognizance under 8 U.S.C. § 1226(a) and/or 8 C.F.R. § 236.1(c)(8) (the "Bond/RoR Subclass").

14.     Respectfully, the named Plaintiffs, M.P.B, Ousmane Soumare, and Lassana Dianifaba on behalf of the Class and Plaintiffs M.P.B. and Mr. Dianifaba on behalf of the Bond/RoR Subclass, ask the Court to vacate the Rescission because it violates the Administrative Procedure Act and the Immigration and Nationality Act (INA).

## II.    JURISDICTION AND VENUE

15.     This Court has jurisdiction under 28 U.S.C. § 1331 (federal question) because this action arises under the Administrative Procedure Act (APA), 5 U.S.C. § 701 *et seq.*, and the United States Constitution. Because this suit seeks relief other than money damages and challenges Defendants' unlawful actions, the United States has waived sovereign immunity from this suit under the APA. 5 U.S.C. § 702.

16.     Venue is proper in the Eastern District of Pennsylvania under 28 U.S.C. § 1391(e)(1) because all the named Plaintiffs reside in this judicial district; each Defendant is an agency of the United States or an officer of the United States sued in their official capacity; and a substantial part of the events giving rise to the claims in this action took place in this District.

## III.    PARTIES

**Plaintiffs**

17.     Plaintiff Ousmane Soumare is a 36-year-old man who is a resident of Philadelphia, Pennsylvania. Mr. Soumare fled enslavement and abuse in his birth-country of Mauritania. After entering the country without inspection in 2023, he was detained for two days. Thereafter, DHS

determined he was neither dangerous nor a flight risk and released him on humanitarian parole pursuant to 8 U.S.C. § 1182(d)(5). Since that time, he has been working various jobs, including preparing and delivering food and providing home care for the elderly and disabled, studying English, and attending religious services at a mosque. He sends money back to support his wife and daughter in Mauritania. He has fully complied with the conditions of his release. He has no criminal history and is pursuing asylum based on his fear of persecution in Mauritania. If his application for asylum is granted, he will continue on the path to permanent residency and, eventually, U.S. citizenship. Despite fully complying with the conditions of his release, he was re-detained at a routine ICE check-in on November 14, 2025, and placed in removal proceedings under 8 U.S.C. § 1229a. He was released from ICE detention several weeks later pursuant to a federal court order directing his release after he filed a habeas petition.[1] That order prohibited ICE from re-detaining Mr. Soumare for seven days, a time period that elapsed on December 9, 2025, which means he is at risk of yet another re-detention. Mr. Soumare is impacted by the policy rescission. Even though ICE released him after the court's order, ICE significantly restricted his liberty by placing him on an intensive supervision program that includes an ankle monitor and routine home visits. Through no fault of his own, his ankle monitor has stopped working on several occasions, prompting additional in-person check-ins that heighten his anxiety that he will re-detained yet again. Under the now-rescinded Changed Circumstances Policy, restrictions on Mr.

---

[1] Order Granting Petition for Writ of Habeas Corpus, *Soumare v. Jamison*, No. 2:25-cv-06490 (E.D. Pa. Dec. 12, 2025) (order by Judge Henry directing Mr. Soumare's immediate release from custody on statutory grounds, finding that he was improperly subjected to detention under 8 U.S.C. § 1225(b)(2), prohibiting ICE from re-detaining him for a period of seven days, and requiring ICE to provide him with a bond hearing within 48 hours after any further re-detention).

Soumare's liberty would not have been increased absent a material change in circumstances. In addition, he has his next ICE check-in on July 28, 2026 and fears he will be re-detained yet again.

18.    Plaintiff M.P.B. is a 36-year-old man who resides in Philadelphia, Pennsylvania. After entering the country without inspection in 2023, M.P.B. was detained, and was placed in removal proceedings under 8 U.S.C. § 1229a. Thereafter, DHS determined he was neither dangerous nor a flight risk and released him on his own recognizance pursuant to 8 U.S.C. § 1226(a) and 8 C.F.R. § 236.1(c)(8). Since his release, M.P.B. has built a life in the United States. M.P.B. received a work permit and began working as an Instructor at a local nonprofit serving the immigrant community. He is also enrolled at a local college, where he received a scholarship to study cybersecurity. He has fully complied with the conditions of his release. He has no criminal history and has filed an application for asylum based on his fear of persecution in Guinea. If his application for asylum is granted, he will continue on the path to permanent residency, and eventually U.S. citizenship. M.P.B. is worried that, despite complying with all release conditions, he will be re-detained at his upcoming ICE check-in on July 21, 2026. Two of his friends who had no change in circumstances have been re-detained at Philadelphia ICE Field Office check-ins and he fears he will be subject to re-detention as well.

19.    Plaintiff Lassana Dianifaba is a 34-year-old man who resides in Philadelphia, Pennsylvania. After entering the country without inspection in April 2023, he was detained and placed in removal proceedings under 8 U.S.C. § 1229a. Thereafter, DHS determined he was neither dangerous nor a flight risk and released him on his own recognizance pursuant to 8 U.S.C. § 1226(a) and 8 C.F.R. § 236.1(c)(8). Since that time, he has built a life in the United States, living with two friends, working as cook, and praying at a local mosque. He sends money back to his wife and son in Senegal. He has fully complied with the conditions of his release and has no

8

criminal history. He is currently pursuing asylum based on his fear of persecution in Senegal. If his application for asylum is granted, he will continue on the path to permanent residency and, eventually, U.S. citizenship. He previously went to an ICE check-in at the same time as one of his friends, who ICE arrested and remains detained. He also recently learned of someone else he knows who was re-detained at an ICE check-in. Mr. Dianifaba has his next ICE check-in scheduled for October 20, 2026; he plans to attend but worries that he too will be re-detained.

**Defendants**

20.     Defendant John E. Rife, sued in his official capacity, is the Acting Field Office Director of the Philadelphia ICE Field Office. In this capacity, he is responsible for the administration of immigration laws and the execution of immigration enforcement and detention policy within ICE's Philadelphia Area of Responsibility, including the Rescission of the Philadelphia Field Office's Changed Circumstances Policy and the November 2025 re-arrest and re-detention of Plaintiff Ousmane Soumare. Defendant Rife maintains an office and regularly conducts business in this District.

21.     Defendant Markwayne Mullen, sued in his official capacity, is the Secretary of Homeland Security. As the highest-ranking officer for DHS, Defendant Mullen has ultimate statutory authority over the agency action challenged in this action. *See* 6 U.S.C. § 557 (transferring functions from the Attorney General).

22.     Defendant DHS is a cabinet-level department of the Executive Branch of the federal government and is an "agency" within the meaning of 5 U.S.C. § 551(1). DHS includes various component agencies, including ICE, Customs and Border Patrol ("CBP") and Citizenship and Immigration Services ("USCIS"). DHS, together with its component agencies, is ultimately responsible for administering and enforcing the agency action challenged in this action.

23.     Defendant David J. Venturella, sued in his official capacity, is the Acting Director of ICE. As the highest-ranking officer for ICE, Defendant Venturella has authority over the agency action challenged in this action.

24.     Defendant ICE is a component agency of DHS. ICE is an "agency" within the meaning of 5 U.S.C. § 551(1). ICE's mission includes the enforcement of civil laws related to immigration. Among other things, ICE is responsible for arrest and detention related to civil immigration charges in the interior of the United States, and is responsible for administering the Rescission of the Changed Circumstances Policy challenged in this action.

## IV.     STATUTORY, REGULATORY, AND CONSTITUTIONAL LAW GOVERNING DHS RE-ARRESTS AND RE-DETENTIONS

### A.     Immigration Detention and Release Provisions

25.     Two provisions of the Immigration and Nationality Act (INA) govern DHS's authority to detain people who do not have administratively final orders of removal.[2]

26.     8 U.S.C. § 1225(b) sets forth DHS's detention authority related to the "inspection" process. The first subsection, § 1225(b)(1), governs the detention of people placed in "expedited removal" proceedings, a fast-track form of removal that historically has applied only at the border and ports of entry and is not at issue in this case. The second subsection, 8 U.S.C. § 1225(b)(2), governs the detention of people who are "applicant[s] for admission," are actively "seeking admission," and are "not clearly and beyond a doubt entitled to be admitted," but who are placed in removal proceedings under 8 U.S.C. § 1229a before an immigration judge.

---

[2] *See* 8 CFR § 1241.1 for the circumstances in which a removal order becomes administratively final.

27.    In contrast, 8 U.S.C. § 1226 governs the detention of people "already in the country pending the outcome of removal proceedings." *Jennings v. Rodriguez*, 583 U.S. 281, 289 (2018). When Congress enacted § 1226, the Immigration and Naturalization Service (INS) (the predecessor agency to ICE, USCIS and CBP) issued an interim regulation making clear that the statute applies to the subset of "applicants for admission" not covered by § 1225(b)(2): those "who are present without having been admitted or paroled." 8 U.S.C. § 1226. In other words, § 1226 applies to people who "entered [the U.S.] without inspection" between ports of entry. 62 Fed. Reg. 10312, 10323 (Mar. 6, 1997).

28.    Section 1226(a) creates a "default rule," which authorizes, *but does not require*, DHS to detain people in 8 U.S.C. § 1229a (INA Section 240) removal proceedings.[3]

29.    A narrower subsection, § 1226(c), mandates detention for certain people based on criminal conduct or terrorist activity that subjects them to removability or inadmissibility. Last year, Congress amended § 1226(c) to also mandate the detention of people who are inadmissible not only because they entered without inspection, but who also have been arrested for or convicted of certain property crimes. *See* Laken Riley Act, Pub. L. No. 119-1, 139 Stat. 3 (2025); 8 U.S.C. § 1226(c)(1)(E).

30.    DHS's authority to release people from custody depends on which detention statute applies.

---

[3] Section 240 removal proceedings refer to the standard removal proceedings under Section 240 of the INA, 8 U.S.C. § 1229a, which entail civil hearings before an immigration judge, in which the government charges a person as removable from, or inadmissible to, the United States, and the person has the opportunity to contest these charges and seek various forms of immigration relief. Section 240 proceedings are one of two forms of removal proceedings described in the INA; the other process is expedited removal under 8 U.S.C. § 1225(b)(1)(A)(i), which provides fewer procedural safeguards, including no right to adjudication by an immigration judge. *See supra*, ¶ 25. This Complaint does not address individuals in expedited removal proceedings.

31.     Section 1226(c) is the most restrictive provision and authorizes release only when necessary under federal witness protection statutes. *See* 8 U.S.C. § 1226(c)(4). In practice, even under this most restrictive release provision, DHS historically has exercised discretion to order release in cases raising serious humanitarian concerns.[4]

32.     On its face, § 1225 also offers few paths to release. People properly subject to either subsection of § 1225 are not statutorily eligible for bond—whether by DHS or an immigration judge—or release on their own recognizance. However, DHS can release them on humanitarian parole. Under the parole statute, 8 U.S.C. § 1182(d)(5)(A), DHS may grant parole to individuals "on a case-by-case basis for urgent humanitarian reasons or significant public benefit" and those who have "serious medical conditions." DHS regulations for parole further explain that parole may only be granted where individuals "present neither a security risk nor a risk of absconding." 8 C.F.R. § 212.5(b).

33.     Section 1226(a) is broader in scope. Under § 1226(a), DHS can release people on bond, on their own recognizance (formally called "conditional parole"), or on humanitarian parole. *See* 8 U.S.C. § 1226(a)(2); 8 C.F.R. § 236.1(8). People who are detained subject to § 1226(a) are also entitled to a bond hearing before an immigration judge, upon request.

34.     Regardless of the provision under which a noncitizen is classified, no one can be released from detention unless DHS first determines that the individual is not a flight risk or a danger to the community. *See* 8 C.F.R. §§ 236.1(c)(8), 1236.1(c)(8) (noncitizen must "demonstrate to the satisfaction of the officer that such release would not pose a danger to property or persons,

---

[4] *See e.g.* Brief of Amicus Curiae American Immigration Counsel, *Hope v. Doll*, No. 20-1784, ECF 42, at 4-9 (3d Cir. May 11, 2020) (gathering examples of individuals detained pursuant to § 1226(c) who were released during the COVID-19 pandemic due to specific medical vulnerabilities).

and that the [noncitizen] is likely to appear for any future proceeding"); *see also* 8 C.F.R. § 212.5 (humanitarian parole available only when "the [noncitizens] present neither a security risk nor a risk of absconding").

35.    Where DHS does not grant release but the noncitizen is detained pursuant to 8 U.S.C. § 1226(a) and thus eligible for a bond hearing, immigration judges likewise must assess whether an individual poses a danger to the community or flight risk when deciding whether to release a noncitizen on bond or their own recognizance. 8 C.F.R. § 1003.19(h)(3); *Matter of Guerra*, 24 I.&N. Dec. 37, 40 (BIA 2006).

36.    Thus, whenever a person is released from immigration custody, there has necessarily been a determination by the government—either DHS or an immigration judge—that the person is not a danger to the community or a flight risk such that continued detention is necessary.

**B.    Re-Arrest and Re-Detention of Non-Citizens**

37.    Statutory and regulatory provisions governing re-arrest and re-detention also depend on the manner of release. At first glance, the authority to re-arrest and re-detain appears to be broad. The INA and federal regulations provide that certain DHS officials "at any time may revoke a bond or [conditional] parole authorized under [§ 1226(a)], rearrest the [noncitizen] under the original warrant, and detain the [noncitizen]." 8 U.S.C. § 1226(b); *see* 8 C.F.R. § 236.1(c)(9). Similarly, certain DHS officials may terminate humanitarian parole upon written notice when they determine that the purpose for parole has been "accomplish[ed]" or when "neither humanitarian reasons nor public benefit warrants the [noncitizen's] continued presence . . . in the United States[.]" 8 C.F.R. § 212.5(e)(2)(i).

13

38.     For decades, however, DHS and its field offices have only re-detained people in removal proceedings when there was a material change in circumstances that justified re-detention.

39.     Specifically, in 1957, the government promulgated a regulation that placed explicit limits on re-detention under the predecessor statutes to 8 U.S.C. § 1226(b) by requiring authorization from the district director within the field office in order to re-detain a previously released individual: "When [a noncitizen] who having been arrested and taken into custody has been released under bond or released on parole, such bond or parole may be revoked at any time in the discretion of the district director, in which event the alien may be taken into physical custody and detained." *See* 22 FR 9765, at 9796 (Dec. 6, 1957) (setting forth the regulation at 8 C.F.R. § 242.1).

40.     In 1997, the regulation was moved to 8 C.F.R. § 236.1(c)(3) and amended to permit certain other director, deputy director, and assistant director officers to authorize re-detention. *See* 62 FR 10312-01, at 10360 (Mar. 6, 1997). In 1998, it was redesignated as 8 C.F.R. § 236.1(c)(9), where it remains today. *See* 63 FR 27441-01, at 27449 (May 19, 1998).

41.     But even this discretion has been cabined. In 1981, the Board of Immigration Appeals (BIA), the appellate immigration court that presides over both removal and immigration custody proceedings, held that "where a previous bond determination has been made by an immigration judge, no change should be made by a District Director absent a change of circumstance." *Matter of Sugay,* 17 I.&N. Dec. 637, 640 (BIA 1981).

42.     Federal immigration officials have reiterated this policy on numerous occasions. For example, the head of the Immigration and Naturalization Service (ICE's predecessor agency) stated in a 1995 memorandum that: "[w]hen a[] [noncitizen] has been released from INS custody under bond, such bond can be revoked by the district director . . . but only based upon 'a change

14

of circumstances.' . . . As such, INS must be able to justify any revocation decision, future detention or release condition." *Demore v. Kim*, 2002 WL 34705774 (U.S. Aug. 29, 2002), (No. 01-1491), Joint Appendix at 57.

43.     Additionally, in 2017 and 2018, DHS acknowledged in litigation that it "has incorporated [the *Matter of Sugay*] holding into its practice, requiring a showing of changed circumstances both where the prior bond determination was made by an immigration judge and where the previous release decision was made by a DHS officer." *Saravia v. Sessions*, 280 F. Supp. 3d 1168, 1197 (N.D. Cal. 2017), *aff'd sub nom. Saravia for A.H. v. Sessions*, 905 F.3d 1137 (9th Cir. 2018). The government also explicitly affirmed that "'DHS generally only re-arrests [a noncitizen] pursuant to § 1226(b) after a material change in circumstances.'" Defs.' Second Supp. Br. at 1, Dkt. No. 90, *Saravia* at 1197. Likewise, the Philadelphia ICE Field Office had a local policy, the Changed Circumstances Policy, that required officers to justify re-arrest and re-detention by first making an individualized determination of a material change in circumstances such that a person now poses a danger to the community or would be a flight risk. *See* infra ¶¶ 54–57 (describing the ICE Philadelphia Field Office's Changed Circumstances Policy).

44.     Given all this, courts have found that despite "the breadth of [the] statutory language" in 8 U.S.C. § 1226(b), the federal government's authority is subject to "an important implicit limitation": it cannot lawfully re-arrest or re-detain someone without "a material change in circumstances." *Saravia* at 1197; *see also Bermeo Sicha v. Bernal*, No. 1:25-cv-00418-SDN, 2025 WL 2494530, at *6 (D. Me. Aug. 29, 2025) ("When DHS released Mr. Bermeo Sicha on conditional parole in the first instance, it necessarily determined that he was 'not a danger to the community or a flight risk.' . . . Therefore, to re-detain him, the government had to show a change of circumstances.") (internal citation omitted).

15

45.     The Fourth Amendment also makes it clear that a person who has already been released by immigration authorities cannot be re-arrested without a material change in their circumstances. Indeed, without the Fourth Amendment's requirement that a government seizure be reasonable, re-arrests absent a material change in circumstances could result in "harassment by continual rearrests." *Holmes*, 452 F.2d at 261 (prohibiting re-arrest without change in circumstances in criminal context). The same Fourth Amendment principles limit the government's seizure authority in immigration arrests. *See Almeida-Sanchez v. United States*, 413 U.S. 266 (1973) (applying Fourth Amendment principles from criminal context to immigration agents); *Yoc-Us v. Att'y Gen. United States*, 932 F.3d 98, 104 (3d Cir. 2019) ("Even though Petitioners are not United States citizens, the relevant Fourth and Fourteenth Amendment rights apply to them" (citing *Wong Wing v. United States*, 163 U.S. 228, 238 (1896))).

46.     This prohibition against re-arrest and re-detention absent a material change in circumstances also derives from the Due Process Clause of the Fifth Amendment. "Freedom from imprisonment—from government custody, detention, or other forms of physical restraint—lies at the heart of the liberty that [the Due Process] Clause protects." *Zadvydas v. Davis*, 533 U.S. 678, 690 (2001). And those due process protections extend to "all 'persons' within the United States, including [noncitizens], whether their presence here is lawful, unlawful, temporary, or permanent." *Id.* at 693.

47.     "The touchstone of due process is protection of the individual against arbitrary action of government," *Wolff v. McDonnell*, 418 U.S. 539, 558 (1974), including "the exercise of power without any reasonable justification in the service of a legitimate governmental objective," *Cnty. of Sacramento v. Lewis*, 523 U.S. 833, 846 (1998). Due process requires that all forms of

civil detention—including immigration detention—bear a "reasonable relation" to a non-punitive purpose. *See Jackson v. Indiana*, 406 U.S. 715, 738 (1972).

48.     The Supreme Court has recognized only two permissible non-punitive purposes for immigration detention: ensuring a noncitizen's appearance at immigration proceedings (or, in the case of a removal order, at removal); and preventing danger to the community. *Zadvydas*, 533 U.S. at 690–92; *see Demore v. Kim*, 538 U.S. 510, 519-20, 527-28, 531 (2003). Critically, these assessments must be based on an "individualized determination" of flight risk and danger to the community. *See INS v. Nat'l Ctr. for Immigrants' Rts., Inc.*, 502 U.S. 183, 194 (1991); *see also Zadvydas*, 533 U.S. at 690; *R.I.L-R v. Johnson*, 80 F. Supp. 3d 164, 188 (D.D.C. 2015); *but see Demore,* 538 U.S. at 531 (upholding brief detention of narrow class of individuals presumed by statute to pose a risk of dangerousness and flight risk by virtue of certain criminal convictions).

49.     Moreover, people who are released from government custody have a protected liberty interest in remaining out of custody. The government's decision to release a person from custody creates "an implicit promise" that their liberty "will be revoked only if [they] fail[ ] to live up to the . . . conditions [of release]." *Morrissey*, 408 U.S. at 482.

50.     Analogously, in the criminal context, the Supreme Court has held that re-detention after conditional release requires a pre-deprivation hearing to comport with due process. *Young v. Harper*, 520 U.S. 143, 152 (1997) (re-detention after pre-parole conditional supervision); *Gagnon v. Scarpelli*, 411 U.S. 778, 782 (1973) (same, in probation context); *Morrissey*, 408 U.S. at 471 (same, in parole context).

51.     These principles apply with at least equal force to people released from civil immigration detention. People who are non-citizens living in the United States have a protected liberty interest in their ongoing freedom from confinement. *See Zadvydas*, 533 U.S. at 690; *see*

*also E.D. v. Sharkey*, 928 F.3d 299, 306–07 (3d Cir. 2019) (holding that people in immigration detention have same due process protections as people in pre-trial detention); *Tarapchak v. Cnty. of Lackawanna*, 739 F. App'x 172, 177 (3d Cir. 2018) (concluding people in pre-trial detention have a greater liberty interest than individuals released on parole).

52.    District courts have recognized that people facing civil re-detention share this constitutionally protected interest in their continued liberty. *See Ortega v. Bonnar*, 415 F. Supp. 3d 963, 969 (N.D. Cal. 2019) (applying *Morrissey* and *Gagnon* to conclude that the noncitizen petitioner had a "liberty interest in remaining out of [immigration] custody"); *see also Meza v. Bonnar*, No. 18-cv-02708-BLF, 2018 WL 2554572, at *3–4 (N.D. Cal. June 4, 2018) (concluding that petitioner raised "serious questions going to the merits" that she had a "vested liberty interest" in her continued release from immigration detention).

53.    Thus, if 8 U.S.C. § 1226(b) were construed as allowing ICE to re-arrest and re-detain noncitizens for any reason—or no reason at all—it would raise serious constitutional questions under both the Fourth Amendment and the Due Process Clause.

## V.    FACTUAL BACKGROUND

### C.    For decades, the Philadelphia Field Office required a material change in circumstances before re-arresting and re-detaining previously released people

54.    Consistent with the federal statutory and regulatory scheme, legal precedent, DHS policy, and the U.S. Constitution, the Philadelphia Field Office adopted and followed the Changed Circumstances Policy, pursuant to which it only re-detained someone after it made an individualized determination that the person had newly become a flight risk or danger to the community.

18

55.    The Changed Circumstances Policy ensured that the Philadelphia Field Office acted consistently with national DHS and ICE policy, federal law and regulation, legal precedent from the BIA and federal courts, and the U.S. Constitution.

56.    Over multiple presidential administrations, the Philadelphia ICE Field Office, under its Changed Circumstances Policy, would not re-arrest or re-detain a noncitizen in or subject to removal proceedings without conducting an individualized assessment to determine whether there had been a material change in circumstances such that the individual now posed a flight risk or danger to the community. This policy and practice applied regardless of whether a noncitizen had previously been released on bond, conditional parole, or humanitarian parole.[5] Morley Decl.

---

[5] In support of this action, Plaintiffs rely on sworn declarations attached as exhibits to the Complaint and submitted by named Plaintiffs, members of the proposed class, legal service providers, a retired Immigration Judge, immigration attorneys, and a community organization that provides accompaniment to ICE check-ins. Except for in this footnote, they will be referred throughout this filing simply by reference to the initials or last name of the declarant.

Declarations from the Named Plaintiffs include:
Exhibit A - Declaration of Ousmane Soumare
Exhibit B - Declaration of M.P.B.
Exhibit C - Declaration of Lassana Dianifaba

Declarations from Witness Declarants include:
Exhibit D - Declaration of A.D.
Exhibit E - Declaration of Demba Sokhona
Exhibit F - Declaration of Balla Toure

Declarations from Attorneys include:
Exhibit G - Declaration of Christopher M. Casazza
Exhibit H - Declaration of Bridget Cambria
Exhibit I - Declaration of Jose C. Campos
Exhibit J - Declaration of Brennan Gian-Grasso
Exhibit K - Declaration of Steven A. Morley
Exhibit L - Declaration of Lilah R. Thompson

Declaration from a Community Based Organization:
Exhibit M – Declaration of Elena Emelchin Brunner

Plaintiffs also rely on a Case Chart of 53 district court decisions involving re-detentions by the

¶ 8, 10 (describing how, in his 25 years in private practice from 1985-2010, he only recalls one re-detention of a client, who had a change in circumstances, and that during his time as an Immigration Judge, which was from 2010 to the middle of 2022, he does not "recall any circumstance" where a person was "re-detained and taken off [his non-detained immigration court] docket); Cambria Decl. ¶¶ 5–6, 8, 11 (describing how she has practiced immigration law for 20 years and that before 2025, the Philadelphia ICE Field Office did not re-detain people absent a material change in their circumstances); Casazza Decl. ¶ 7 (describing how it "was unheard of to have a law-abiding individual in active removal proceedings without any changed circumstances be detained at a routine check-in); *see also id.* ¶ 3 (describing how he has practiced immigration law in Pennsylvania for 16 years); Gian-Grasso Decl. ¶¶ 9–10 (describing how he has practiced immigration law for 16 years in Pennsylvania and that before 2025, the Philadelphia ICE Field Office did not re-detain people absent a material change in circumstances); Campos Decl. ¶¶ 3, 6–8 (describing his 18 years of experience as an immigration attorney in Pennsylvania and that in 2025, he saw a shift where the Philadelphia Field Office began re-detaining people absent a material change in circumstances); Thompson Decl. ¶¶ 1, 6, 16 (describing her experience working as an the Executive Office for Immigration Review (EOIR) attorney advisor and her current position her position as the Chief of the Community Defense Unit (Immigration Legal Practice) at the Defender Association of Philadelphia and that prior to 2025, the Philadelphia ICE Field Office did not re-detain people absent a material change in circumstances). For example, under the Changed Circumstances Policy, if a noncitizen became involved with the criminal legal system, violated a condition of ICE supervision, or violated a condition of the Intensive Supervision

---

Philadelphia ICE Field Office where the decision discussed or referenced compliance with release requirements. In the complaint, this document, which is attached as Exhibit N, will be referred to as Case Chart.

Appearance Program (ISAP), ICE would set an appointment and interview the non-citizen before making an individualized decision whether there had been a material change in circumstances such that re-detention was warranted. Conversely, if the person was late to or missed a check-in but affirmatively sought to remedy this, ICE would not re-detain the noncitizen. Gian-Grasso Decl. ¶ 10 ("I . . . generally did not see clients being re-detained for minor infractions like a late or missed appointment[,] or if they had a geographic limitation and accidentally went beyond it. These were not seen as a basis for re-detention.").

57.    People within the jurisdiction of the Philadelphia Field Office, released pending immigration or removal proceedings, have relied on the Changed Circumstances Policy to plan their lives. Cambria Decl. ¶ 11 (describing how as long as people complied with the terms of their release, they would not be subject to re-detention and it was a "predictable and trusted process"); Thompson Decl. ¶ 6 (discussing how clients and pro se people could count on the fact that complying with their supervision meant they would not be re-detained and they went about their lives accordingly). So long as they complied with the conditions of their release, those people could—and did—confidently assume they would be able to litigate their right to remain in the United States while living and working in the community and caring for their families without fear of detention. This meant they could access and consult with legal representatives, enter into leases for residential housing, seek work authorization and lawful employment, invest in their education, develop community ties, participate in religious life, and grow and take care of their families (including U.S. citizen family members). *See e.g.*, A.D. Decl. ¶¶ 8–10; M.P.B. Decl. ¶¶ 5–9; Dianifaba Decl. ¶¶ 7–9; Soumare Decl. ¶¶ 7–11; Toure Decl. ¶¶ 5–6; Sokhona Decl. ¶¶ 8–9; Casazza Decl. ¶ 12.

21

**D.      In the middle of 2025, the Philadelphia ICE Field Office rescinded its Changed Circumstances Policy, thus permitting re-detentions despite no change in circumstances**

58.      Sometime toward the middle of 2025, Defendants rescinded the Philadelphia ICE Field Office's longstanding Changed Circumstances Policy. Gian-Grasso Decl. ¶ 12; Casazza Decl. ¶¶ 8–9; Thompson Decl. ¶ 7; Campos Decl. ¶ 8; Cambria Decl. ¶ 7; Emelchin-Brunner Decl. ¶ 7.

59.      The Rescission of the Changed Circumstances Policy eliminates the requirement that, *before* a person previously released from immigration custody on recognizance, parole, or bond can be re-arrested and re-detained, the Philadelphia ICE Field Office must conduct an individualized assessment and determine that materially changed circumstances make the person a danger to the community or a flight risk so as to justify their re-arrest and re-detention.

60.      Following the Rescission, ICE agents in the Philadelphia ICE Field Office have re-arrested and re-detained scores of individuals without making an individualized finding of changed circumstances. Gian-Grasso Decl. ¶ 13; Cambria Decl. ¶ 9. While these re-arrests and re-detentions following the Rescission are happening throughout the Philadelphia ICE Field Office's Area of Responsibility, most striking is where they are concentrated: at ICE and ISAP offices where people appear for required check-ins. Casazza Decl. ¶ 5 (estimating his firm has handled habeas cases for about 190 people who were re-detained at ICE check-ins since September 2025); Thompson Decl. ¶¶ 10–14 (discussing how they have represented 45 people re-detained at ICE check-ins since the middle of 2025); Cambria ¶¶ 8–9 (discussing examples of re-detentions); Campos Decl. ¶ 8 (same); Emelchin Brunner Decl. ¶ 7 (same); *see also* Case Chart (summarizing 53 habeas cases filed in Pennsylvania's three U.S. District Courts of 54 instances that involve re-detentions by the Philadelphia ICE Field Office at ICE check-ins).

22

61.     These check-in appointments, which used to be brief and routine, have now become occasions for re-arrest and re-detention. Cambria Decl. ¶¶ 9, 11; Casazza Decl. ¶¶ 7–9; *see also id*. ¶ 7 (discussing how re-arrests and re-detentions at ICE check-ins prior to 2025 was "unheard of"); Thompson Decl. ¶ 6. When people arrive at their local ICE Field Office or ISAP office, rather than conducting the regular "check-in," Defendants instead seize them, separate them from family or legal representatives who have accompanied them, handcuff them, and re-arrest and re-detain them. Campos Decl. ¶ 11. Thompson Decl. ¶¶ 7, 9, 12. These re-arrests and re-detentions are without regard to people's individual circumstances, or any evidence of flight risk or dangerousness. Casazza Decl. ¶ 10; Gian-Grasso ¶ 13; Cambria ¶¶ 9, 11; Emelchin Brunner Decl. ¶¶ 7, 15; Thompson Decl. ¶ 13.

62.     Many who have been re-arrested and re-detained following the Rescission of the Changed Circumstances Policy had regularly attended these "check-in" appointments with ICE or ISAP for months or years while they pursued their immigration cases. *See generally* Soumare Decl.; M.P.B. Decl.; Dianifaba Decl.; A.D. Decl.; Sokhona Decl.; Toure Decl.; *see also* Thompson Decl. ¶ 14 (describing 18 cases where the Court discussed how the person had complied with all the terms of their supervision over the course of months or years); *see also id*. ¶¶ 10–12 (describing additional case examples where clients have been re-detained despite no material change in circumstances); Emelchin Brunner Decl. ¶ 14; *see also* Case Chart (summarizing 53 habeas cases involving 54 people where Pennsylvania's three U.S. district courts discussed how the person had complied with all supervision requirements, including ICE check-ins, over a course of months or years).

63.     With the Rescission of the Changed Circumstances Policy, Defendants are re-arresting and re-detaining people who have had no change in circumstances that would render

them a flight risk or danger to the community since their release from DHS custody. *See generally* Soumare Decl.; M.P.B. Decl.; Dianifaba Decl.; A.D. Decl.; Sokhona Decl.; Toure Decl.; *see also* Casazza Decl. ¶ 5 (describing how "[t]he vast majority of [their] habeas cases involving re-detentions involved people who did not have a material change in circumstances" and that out of 293 habeas petitions filed since September 2025, about 65% of those (about 190) involved re-detentions at ICE check-ins within the Philadelphia ICE Field Office's Area of Responsibility); Thompson Decl. ¶ 13 (out of the 45 habeas petitions they have filed for clients re-detained at check-ins, "[i]n none . . . has ICE said that the reason they re-detained [their] clients was due to a material change in their circumstances."). On the contrary, Defendants are arresting people without regard for—and despite—people's demonstrated compliance with their supervision requirements. *See generally* Soumare Decl.; M.P.B. Decl.; Dianifaba Decl.; A.D. Decl.; Sokhona Decl.; Toure Decl.; *see also* Cambria Decl. ¶¶ 8–9; Gian-Grasso Decl. ¶ 13; Campos Decl. ¶ 8.

64.    Indeed, following the Rescission of the Changed Circumstances Policy, the Philadelphia ICE Field Office has adopted new procedures at check-ins to reduce the use of self-service only kiosk check-ins and increase the time most people spend physically present at the Field Office and possibly subject to re-detention. *See* Soumare Decl. ¶¶ 22–24; A.D. Decl. ¶¶ 12–14; Balla Toure Decl. ¶¶ 4, 8–10; Sokhona Decl. ¶¶ 11–13; Dianifaba Decl. ¶¶ 13–17; Casazza Decl. ¶ 7; Thompson Decl. ¶ 7.

65.    Additionally, on information and belief, after the Rescission of the Changed Circumstances Policy, the Philadelphia ICE Field Office is re-arresting and re-detaining non-citizens released pursuant to 8 U.S.C. § 1226(a) without the express authorization of "the district director, acting district director, deputy district director, assistant district director for

investigations, assistant district director for detention and deportation, or officer in charge," in violation of 8 C.F.R. § 236.1(c)(9).

### 1. Re-detentions despite no change in circumstances have also occurred elsewhere

66.    While the Philadelphia ICE Field Office's decision to rescind the Changed Circumstances Policy has wreaked havoc and sown fear in Pennsylvania and other states under the office's area of responsibility, ICE field offices elsewhere have also recently begun to re-arrest and re-detain noncitizens absent changed circumstances.

67.    For example, the ICE San Francisco Field Office adopted a new policy to re-arrest and re-detain people despite no material change in their circumstances, including at ICE check-ins and at immigration court. *Garro Pinchi*, 813 F. Supp. 3d at 992. That policy has been stayed by a U.S. district court, which found that the named Plaintiffs and proposed class were likely to succeed in their claim that the local field office's policy change violated the APA because it was arbitrary and capricious. *Id.* at 1037–38.

68.    In New York City, the local field office faced a similar legal challenge for its policy and practice of re-arresting and re-detaining people attending their immigration court hearings without regard to their individual circumstances. *African Communities Together v. Lyons*, No. 25-cv-6366, 2026 WL 1382944 (S.D.N.Y. May 18, 2026). That policy has likewise been stayed. *Id.* at *8.

69.    ICE officers have also been documented making arrests at routine appointments in Kentucky, Wisconsin, and Texas.[6]

---

[6] Morgan Watkins, *Court records confirm Louisville activists' warning about immigrant arrests*, Louisville Public Media (Mar. 10, 2026), https://www.lpm.org/investigate/2026-03-10/court-records-confirm-louisville-activists-warnings-about-immigrant-arrests; (last visited June 22, 2026); Evan Casey, *Wisconsin mom who won green card detained by ICE after routine check-in,*

### 2. The Philadelphia ICE Field Office's Rescission of the Changed Circumstances Policy unfolded amid a nationwide push to increase arrests and detentions

70.    The Philadelphia ICE Field Office's Rescission of the Changed Circumstances Policy was done following a well-publicized effort led by the White House, DHS, and ICE nationally to increase immigration arrests and detentions regardless of the individual circumstances of the people arrested and detained.

71.    For example, in late May 2025, the White House and the Department of Homeland Security imposed a "goal" on federal immigration agencies of 3,000 immigration-related arrests per day—with "consequences for not hitting arrest targets."[7]

72.    In order to reach these quotas, White House Deputy Chief of Staff Stephen Miller directed high-level officials to intensify their tactics related to stops and arrests in the field. Miller directed that agents and officers should no longer conduct arrests based on individualized findings of flight risk or danger. Instead, they should "just go out there and arrest [unauthorized noncitizens]" by rounding up people in public spaces like "Home Depot" and "7-Eleven" convenience stores.[8] Agents were bluntly told that arrests were "all about the numbers, not the level of criminality" or other indicia of flight risk or danger.[9]

---

WPR (Mar. 13, 2026), https://www.wpr.org/news/wisconsin-mom-who-won-green-card-detained-by-ice-after-routine-check-in (last visited June 22, 2026); Sandra Sanchez, *Pastor Says ICE arresting congregants at check-ins,* Border Report (Dec. 17, 2025), https://www.borderreport.com/border-report-tour/immigration/pastor-says-ice-arresting-congregants-at-check-ins/ (last visited June 22, 2026).
[7] Elizabeth Findell, et al., *The White House Marching Orders That Sparked the L.A. Migrant Crackdown*, The Wall Street Journal (June 9, 2025), https://www.wsj.com/us-news/protests-los-angeles-immigrants-trump-f5089877 (last visited June 22, 2026).
[8] *Id.*
[9] Ted Hesson & Kristina Cooke, *ICE's Tactics Draw Criticism as it Triples Daily Arrest Targets,* Reuters, June 10, 2025, https://www.reuters.com/world/us/ices-tactics-draw-criticism-it-triples-daily-arrest-targets-2025-06-10/ (last visited June 22, 2026); Alayna Alvarez & Brittany Gibson, *ICE Ramps Up Immigration Arrests in Courthouses Across the U.S.*, Axios, June 12, 2025,

73.     In a May 28, 2025 interview with Fox News, Mr. Miller stated that "Under President Trump's leadership, we are looking to set a goal of a minimum of 3,000 arrests for ICE every day, and President Trump is going to keep pushing to get that number up higher each and every single day."[10]

74.     Simultaneously, the Administration has moved to radically increase immigration detention capacity nationwide. On July 4, 2025, President Trump signed the "One Big Beautiful Bill" into law. The legislation makes U.S Immigration and Customs and Enforcement the largest federal law enforcement agency, giving it $45 billion for building new detention centers and $14 billion for deportation operations. The legislation also includes $3.5 billion for reimbursements to state and local governments for costs related to immigration-related enforcement and detention.[11]

75.     "Border czar" Tom Homan told reporters that the bill was needed so the federal government could buy more detention beds because "the more beds we have, the more bad guys we arrest."[12]

76.     Government officials have also suggested that this new push for maximum detention is part of an effort to coerce individuals to self-deport, *i.e.*, to give up their right to contest removal and agree to deportation. Coercing individuals to "self-deport" is not one of the two constitutionally permissible bases for immigration detention, preventing flight risk or danger to the community. For instance, when then-Secretary Noem discussed how the administration has

---

https://www.axios.com/2025/06/12/ice-courthouse-arrests-trump (last visited June 22, 2026).

[10] *Vasquez Perdomo v. Noem*, 148 F. 4th 656, 665 n. 2 (9th Cir. Aug. 1, 2025)

[11] Lauren-Brooke Eisen, *Budget Bill Massively Increases Funding for Immigration Detention*, Brennan Center for Justice, July 3, 2025, https://www.brennancenter.org/our-work/analysis-opinion/budget-bill-massively-increases-funding-immigration-detention (last visited June 22, 2026).

[12] Juliana Kim, *How Trump's tax cut and policy bill aims to 'supercharge' immigration enforcement*, NPR, July 3, 2025, https://www.npr.org/2025/07/03/g-s1-75609/big-beautiful-bill-ice-funding-immigration (last visited June 22, 2026).

27

opened detention facilities in seemingly treacherous locations, she offered that detention is an effective strategy to encourage people, including those with meritorious claims for immigration relief, to deport themselves "voluntarily."[13] Immigration detention for general deterrence purposes is also unlawful. *Kansas v. Crane*, 534 U.S. 407, 412 (2002) (discussing how civil detention may not "become a 'mechanism for retribution or general deterrence'—functions properly those of criminal law, not civil commitment") (quoting *Kansas v. Hendricks*, 521 U.S. 346, 372–73 (1997) (Kennedy, J., concurring)); *see also Kansas*, 521 U.S. at 373; *R.I.L-R*, 80 F. Supp. 3d at 188-190 (rejecting the Government's claim that an interest in deterring mass migration was a "permissible justification" for civil immigration detention).

77.    In Pennsylvania, the administration further expanded detention space through agreements with the Federal Bureau of Prisons (BOP) to detain people at the two BOP prisons.[14] The administration already has contracts with four Pennsylvania county jails to detain people for ICE and the largest ICE detention facility currently in Pennsylvania (and the Northeast) is Moshannon Valley Processing Center ("Moshannon"), run by the private prison company The GEO Group, Inc., through an Intergovernmental Services Agreement with Clearfield County. Moshannon has capacity to detain nearly 1,900 people.

78.    ICE arrest tactics have also shifted here in Pennsylvania. According to publicly available data, the Philadelphia ICE Field Office has greatly increased the number of arrests of

---

[13] Nicole Sganga, *Kristi Noem says "Alligator Alcatraz" to be model for ICE state-run detention centers*, CBS News, Aug. 4, 2025, https://www.cbsnews.com/news/alligator-alcatraz-model-kristi-noem-homeland-security/ (last visited June 22, 2026).

[14] John Beauge, *Pa. prison is among federal facilities that will hold ICE detainees*, Penn Live June 30, 2025, https://www.pennlive.com/news/2025/06/pa-prison-is-among-federal-facilities-that-will-hold-ice-detainees.html (last visited June 22, 2026); Fallon Roth and Jeff Gammage, Philadelphia's Federal Detention Center will house ICE detainees, Philadelphia Inquirer, Feb. 21, 2025, https://www.inquirer.com/politics/nation/federal-detention-center-immigrant-arrests-20250221.html (last visited June 22, 2026).

people under the Alternative to Detentions (ATD) program, a supervised released program for people previously detained by DHS. In 2025, out of 479 arrests categorized as an ATD associated arrest, conducted by the Philadelphia ICE Field Office, about 75% occurred from June 2025 to December 2025, a period following the Rescission.[15]

79.    In addition, for all the rhetoric that increased immigration enforcement is about public safety, ICE's own data shows that most people ICE is arresting have no criminal charges or criminal convictions—assuming for argument that detaining someone based on an unsubstantiated charge or a conviction for a non-violent offense even bears on public safety.

80.    For example, according to publicly available data for 2026 so far, about 77% of the Philadelphia ICE Field Office's arrests categorized as an ATD associated arrest, which is for people who ICE either released from detention previously or determined they did not have to detain, involve re-arrests of people with no criminal charges or convictions.[16]

**E.    Plaintiffs and members of the proposed Class and Sub-Class who pose no flight risk or danger to the community now face re-detention following the unlawful Rescission of the Changed Circumstances Policy.**

81.    The Philadelphia ICE Field Office's Rescission of the Changed Circumstances Policy has resulted in the sudden detention of many people whom the government has already

---

[15]    *See* Deportation Data Project, *Dataset: Administrative Arrests*, https://ice-arrests.apps.deportationdata.org/ (last visited June 19, 2026). As the website notes, there is missing data and it is not clear how many, if any, of the missing data is from the Philadelphia ICE Field Office.

[16] The 2026 data is available through March 6, 2026 so far. The 77% figure comes from a total of 88 arrests where the person detained is categorized has having an immigration offense only. The total arrests of people under ATD so far is 114 (which includes people with pending criminal charges and people with convictions, along with people with immigration offenses). *See* Deportation Data Project, *Dataset: Administrative Arrests*, https://ice-arrests.apps.deportationdata.org/ (last visited June 19, 2026).

determined are not dangerous or flight risks. These re-detentions have occurred without any justification of new or changed circumstances.

82.    Indeed, people caught up in the new policy overwhelmingly lack any indicia of dangerousness and have a proven record of compliance with immigration check-ins. *See generally* Soumare Decl.; M.P.B. Decl.; Dianifaba Decl.; A.D. Decl.; Sokhona Decl.; Toure Decl.; *see also* Casazza Decl. ¶ 5 (estimating his firm has handled habeas cases for 190 people who were re-detained at ICE check-ins since September 2025 and that the vast majority had no change in circumstances); Thompson Decl. ¶ 14 (describing 18 cases where their clients had no change in circumstances; *see also id*. ¶¶ 10–12 (additional examples of re-detentions); Cambria ¶ 7; Campos Decl. ¶ 8; Emelchin Brunner Decl. ¶¶ 7, 14; *see also* Case Chart (summarizing 53 habeas cases filed in Pennsylvania's three U.S. district courts that involve 54 instances of re-detentions by the Philadelphia ICE Field Office at ICE check-ins where the person was in compliance with the terms of their release and was nevertheless re-detained). They have dutifully complied with the requirements placed on them and have shown that the government's initial assessment of them was accurate—they are neither dangerous nor flight risks. Nevertheless, they are now subject to sudden, arbitrary re-arrest and re-detention, which induces extreme fear and anxiety over every ICE encounter. *See, e.g.*, Emelchin Brunner Decl. ¶ 15 ("Our community members now live in a state of constant fear that they are going to be taken away when they go to the ICE Philadelphia Field Office for their mandatory check-ins."); *see also* M.P.B. Decl. ¶ 14–17; Soumare Decl. ¶ 39; Toure Decl. ¶ 16; Dianifaba Decl. ¶ 18–20. Plaintiffs' and declarants' cases illustrate these concerns.

83.    Plaintiff Ousmane Soumare is an asylum seeker who fled slavery in Mauritania. Soumare Decl. ¶ 2. After he entered the United States without inspection on or around May 9,

2023, he was detained by federal immigration officials. Soumare Decl. ¶ 3. He was detained for two days before federal agents determined he was not a flight risk or a danger to the community and released him on parole. Soumare Decl. ¶ 3. One condition of his parole was to report to ICE within sixty days of his release. Soumare Decl. ¶ 4. This order for Mr. Soumare to report to ICE stated, "Failure to contact the local ICE office as instructed may result in your arrest and/or a loss of the right to any possible relief."

84.     After his release from immigration detention, Mr. Soumare moved to Philadelphia, Pennsylvania, where he built a life. Soumare Decl. ¶¶ 5, 8. He did everything that immigration authorities asked of him, including reporting to ICE within sixty days and has attended all ICE check-ins. Soumare Decl. ¶ 7. He hired an attorney to navigate the asylum process. Soumare Decl. ¶ 7. With the aid of counsel, Mr. Soumare timely filed an I-589 "Application for Asylum and Withholding of Removal" with the immigration court. This application remains pending. Soumare Decl. ¶ 7. Mr. Soumare has no criminal history. Soumare Decl. ¶ 21.

85.     At a regularly scheduled ICE check-in on November 14, 2025, an ICE officer led him from the waiting room to a side room, and informed Mr. Soumare that he was being arrested. Soumare Decl. ¶¶ 22–23. The officer did not provide an individualized basis for his detention or claim that his detention was justified because he was a prevent flight risk or danger to the community. *See* Soumare Decl. ¶¶ 23–25.

86.     In connection with his re-arrest and re-detention, ICE issued a Form I-200 "Warrant for Arrest of Alien," purporting to authorize his arrest under 8 U.S.C. § 1226 and 8 U.S.C. § 1357. The document is dated November 14, 2025. ICE alleged the following bases for Mr. Soumare's arrest: "the pendency of ongoing removal proceedings" against him, "biometric confirmation of [his] identity and a records check of federal databases" indicating that Mr. Soumare lacks

immigration status or is otherwise removable, and "statements made voluntarily by [Mr. Soumare] to an immigration officer and/or other reliable evidence" that indicates that he lacks immigration status or is otherwise removable from the United States. The warrant bears the signature of Thomas Romaine, Deportation Officer.

87.    Also at the time of his re-arrest and re-detention, ICE placed Mr. Soumare into removal proceedings pursuant to 8 U.S.C. § 1229a. On Mr. Soumare's Notice to Appear—the charging document for removal proceedings—DHS classified him as "an alien present in the United States who has not been admitted or paroled." He was not classified as an "arriving alien."

88.    Defendants detained Mr. Soumare after rescinding the Changed Circumstances Policy and despite the fact that he posed no danger or flight risk—the only two justifications for immigration detention recognized by the Supreme Court. *See Zadvydas* 533 U.S. at 690-92; *Demore* 538 U.S. at 531.

89.    Nothing about Mr. Soumare's circumstances has materially changed since the government released him in 2023 after determining that he did not pose sufficient risk of flight or danger to the community to warrant detention. Mr. Soumare has no criminal record, and there is no basis to believe that he poses any public safety threat. *See* Soumare Decl. ¶ 21. Nor is Mr. Soumare, who was arrested while appearing for an immigration check-in, and who has dutifully attended all prior check-ins and affirmatively sought asylum, conceivably a flight risk. *See* Soumare Decl. ¶¶ 19–21. Yet following the Philadelphia ICE Field Office's Recission of the Change in Circumstances Policy, Mr. Soumare was nonetheless detained and deprived of his constitutionally protected liberty interest.

90.    A federal court granted a habeas petition directing Mr. Soumare's release, but he remains at risk of yet another re-detention because the order only prohibited re-arrest and re-

32

detention for seven days thereafter. Order Granting Petition for Writ of Habeas Corpus, *Soumare v. Jamison*, No. 2:25-cv-06490 (E.D. Pa. Dec. 2, 2025).

91.     Following his release from custody pursuant to the Court Order, ICE did not return Mr. Soumare to the *status quo ante.* Rather, ICE significantly increased restrictions on Mr. Soumare's liberty, imposing new conditions of release, including an ankle monitor, regular home check-ins, and in-person check-ins. Soumare Decl. ¶¶ 34–36. Prior thereto, ICE required only periodic in-person check-ins. Soumare Decl. ¶ 7. Mr. Soumare has dutifully complied with his additional and new conditions of release. Soumare Decl. ¶ 34. But the new, onerous release conditions heighten Mr. Soumare's fears that he will be re-detained. Soumare Decl. ¶ 38. His ankle monitor has already malfunctioned multiple times, requiring him to go promptly to the ISAP office to obtain a replacement. Soumare Decl. ¶ 35. These additional interactions with ISAP, plus more in-person check-ins and home visits, provide Defendants with multiple new opportunities to re-detain Mr. Soumare. Soumare Decl. ¶¶ 38–39. In addition, his next check-in is on July 28, 2026, which he worries will lead to his re-detention yet again. *Id*. ¶ 39

92.     M.P.B. is an asylum seeker who fled Guinea in 2023. M.P.B. Decl. ¶¶ 2, 5. After entering the country without inspection, he was arrested by federal immigration authorities. M.P.B. Decl. ¶ 3. M.P.B. was detained for about two days before immigration officials determined that he was not a flight risk or a danger to the community and released him on his own recognizance under 8 C.F.R. § 236.1(c)(8). M.P.B. Decl. ¶¶ 3–4. On the Notice to Appear, DHS classified him as "an alien present in the United States who has not been admitted or paroled" and did not classify him as an "arriving alien."

93.     DHS agents issued M.P.B. an "Order of Release on Recognizance" using a standard DHS form, setting forth the conditions of his conditional parole. Among other requirements, the

form stated that M.P.B. must comply with state and federal laws and report to supervision appointments through the Alternatives to Detention (ATD) program. The order also states that M.P.B. would remain released on his own recognizance as long as he "compl[ied]" with the listed conditions. The order states that "[f]ailure to comply with the conditions of this order may result in revocation of your release and your arrest and detention by [DHS]," but includes no other possible reasons for which M.P.B. could be re-detained.

94.    Since moving to Philadelphia, M.P.B. has built a life for himself. M.P.B. Decl. ¶ 6. He has volunteered at multiple organizations and secured a job as an instructor at a nonprofit organization. M.P.B. Decl. ¶ 6. He is studying English, and also received a scholarship to pursue an Associate's Degree program in Cybersecurity at a local college. M.P.B. Decl. ¶¶ 8–9. He has received multiple awards for his leadership within the campus community. M.P.B. Decl. ¶ 9.

95.    M.P.B. complied with all requirements of his ATD program. M.P.B. Decl. ¶¶ 4, 10. In fact, after he showed compliance with phone check-ins for four months, he was asked to return the phone he used for regular remote check-ins, and was given paperwork which explained that he now only had to attend check-ins at the ICE office. M.P.B. Decl. ¶¶ 10–11. He attended his 2023, 2024, and 2025 check-ins without incident. M.P.B. Decl. ¶¶ 11–12. However, M.P.B. knows two people who did not have a change in circumstances that have been recently re-detained at their ICE checks and has seen news reports about ICE arresting people at their ICE check-ins. M.P.B. Decl. ¶¶ 14–15. He worries that it could happen to him, too. M.P.B. Decl. ¶¶ 14–15. This causes him significant distress. M.P.B. Decl. ¶¶ 14–15.

96.    M.P.B. has an upcoming ICE check-in scheduled for July 21, 2026. M.P.B. Decl. ¶ 12. Under the Changed Circumstances Policy, he could attend his check-ins confident that he would not be re-detained based on his compliance with his terms of release and lack of any criminal

history. However, since the Changed Circumstances Policy has been rescinded, he risks being torn away from his studies and losing his scholarship, his work, and his community without just cause. *See* M.P.B. Decl. ¶¶ 16–17.

97.    Plaintiff Lassana Dianifaba is an asylum seeker who fled Senegal and entered the United States without inspection on or around April 24, 2023. Dianifaba Decl. ¶¶ 2–3. After entering the country, he turned himself into federal immigration agents. Dianifaba Decl. ¶ 3. He was detained for six or seven days before federal agents determined that he was not a flight risk or danger to the community and released him on his own recognizance under 8 C.F.R. § 236.1(c)(8). *See* Dianifaba Decl. ¶¶ 4–5. He was given a notice to appear for removal proceedings in the Philadelphia immigration court. On the Notice to Appear, DHS classified him as "an alien present in the United States who has not been admitted or paroled" and did not classify him as an "arriving alien." The agents told him that he would need to attend periodic check-ins.

98.    DHS agents issued Mr. Dianifaba an "Order of Release on Recognizance" using a standard DHS form, setting forth the conditions of his conditional parole. Among other requirements, the form stated that he must comply with state and federal laws and report to any hearing or interview as directed by DHS or EOIR. The order also states that Mr. Dianifaba would remain released on his own recognizance as long as he "compl[ied]" with the listed conditions. The order states that "[f]ailure to comply with the conditions of this order may result in revocation of your release and your arrest and detention by [DHS]," but includes no other possible reasons for which he could be re-detained.

99.    Mr. Dianifaba hired a lawyer and timely filed an application for asylum in or around October 2023. Dianifaba Decl. ¶ 6. He had an initial master calendar hearing in his removal proceedings in June 2024. *Id*. ¶ 6. He attended his first check-in with ICE. Dianifaba Decl. ¶ 10.

35

He has attended all subsequent check-ins and worked with his attorney to promptly re-schedule a check-in that he was unable to attend because he was sick. *Id*. ¶¶ 10–15. He has no criminal history. *Id*. ¶ 21. Since settling in Philadelphia, Pennsylvania, Mr. Dianifaba has built a life working as a cook, developing a community of friends, and praying at a nearby mosque. *Id*. ¶¶ 7–9. He sends money back to support his family, including his wife and three-year-old son. *Id*. ¶ 9.

100.    Mr. Dianifaba has an upcoming ICE check-in on October 20, 2026. *Id*. ¶ 17. Before, under the Changed Circumstances policy, Mr. Dianifaba could attend his future supervision appointments confident that he would not be re-detained, based on his compliance with his terms of release and lack of any criminal history. Now that the policy has been rescinded, he risks being re-detained for no reason. He is acutely aware of the risk of his re-detention: one of his friends, who was his roommate, was re-detained by the Philadelphia ICE field office at a check-in that the two of them attended together. *Id*. ¶¶ 13–14, 18. Mr. Dianifaba's friend remains in ICE custody at the time of the filing. *Id*. ¶ 18.

101.    In 2023, the government released Mr. Dianifaba after finding that he did not pose a flight risk or danger to the community. *Id*. ¶ 5. His conduct since he was released has only reinforced that determination. *See Id*. ¶¶ 6, 10–14, 21. His re-detention due to the Rescission of the Changed Circumstances Policy would deprive him of his protected interest in his ongoing liberty without any procedural protections.

102.    On information and belief, there are more than 200 other people who have been re-arrested and re-detained by the Philadelphia ICE Field Office with similar facts and no changed circumstances to justify any of the Plaintiffs' detention. Casazza Decl. ¶ 5 (estimating his firm has handled habeas cases for 190 people who were re-detained at ICE check-ins since September 2025 and that the vast majority who were re-detained had no material change in their circumstances);

36

Thompson Decl. ¶¶ 10–14 (explaining 21 client case examples and stating that they are like dozens of others where the person was re-detained despite no material change in circumstances); Emelchin Brunner Decl. ¶ 13 (providing an example of a re-detention); Case Chart (summarizing 53 habeas cases filed in Pennsylvania's three U.S. district courts of 54 incidents that involve re-detentions by the Philadelphia ICE Field Office at ICE check-ins where the person re-detained had no material change in circumstances); *see also* Cambria ¶¶ 8–9 (explaining how the re-detentions have a "common pattern" of re-detaining people despite no material change in circumstances and explaining that many re-arrests and re-detentions are occurring at the Philadelphia ICE Field Office); Campos Decl. ¶ 8 (discussing the types of re-arrests and re-detention cases he is aware of).

103.    For example, A.D. is a 23-year-old asylum seeker from Guinea who entered the U.S. without inspection in January 2024. A.D. Decl. ¶¶ 2–3. Shortly after crossing the border into Arizona, he encountered immigration officials who took him to a camp where he was detained. *Id*. ¶ 3. After about two days, he was given a Notice to Appear and taken to a hotel where he waited for a flight to Philadelphia. *Id*. ¶¶ 5–7. He was also told that he needed to report to the ICE Office for check-ins. *Id*. ¶ 6. Since arriving in Philadelphia, he has attended every check-in appointment. *Id*. ¶ 8. He filed a timely asylum application *pro se* in 2024. *Id*. Once he received a work permit and social security card, he was able to start working at the airport, preparing food for flights. *Id*. ¶¶ 8, 10. He hired an immigration attorney in 2025 with the money he earned from this job. *Id*. ¶ 8. In Philadelphia, A.D. opened a bank account and worked hard to build his credit score. *Id*. ¶ 9. He also contributed to living expenses at his friend's house, where he was living. *Id*.

104.    A.D. had a check-in with ICE scheduled for September 8, 2025. *Id*. On the day of his check-in, he arrived early. *Id*. He had told his attorney that he was feeling nervous about his

37

appointment because he had heard reports of people being arrested at their check-ins. *Id*. His fear was borne out: after checking in at the kiosk in the lobby, a security guard told him to go upstairs, where ICE agents arrested him. *Id*. ¶¶ 13–14. One of the agents said that ICE had to detain him because he had entered the U.S. illegally. *Id*. ¶ 14.

105.    A.D. was first detained at Federal Detention Center ("FDC") Philadelphia, where his mental and physical health deteriorated. *Id*. ¶¶ 17–20. These challenges continued after he was transferred to Moshannon. *Id*. ¶¶ 22–26. His lawyer filed a petition for habeas corpus and the Court ordered that an IJ conduct a bond hearing. *Id*. ¶ 27. The IJ authorized A.D.'s release and he was freed in April 2026. *Id*. ¶ 28. He lost his job and his credit score declined substantially because he could not make payments while detained. *Id*. ¶¶ 29–30. He lives in fear of re-detention. *Id*. ¶ 33.

106.    Declarant Demba Sokhona is a 31-year-old asylum seeker who came to the United States after escaping enslavement and persecution in Mauritania. Sokhona Decl. ¶¶ 2–3. He entered the U.S. without inspection in July 2023. *Id*. ¶ 4. Shortly after crossing into the U.S., CBP encountered him in Arizona, and detained him for two or three days. *Id*. ¶ 5. When he was released, CBP gave him papers, which he did not understand because he cannot read or write, and CBP did not provide interpretation in his native language Soninke. *Id*. ¶ 5. He was later able to confirm with other Soninke-speaking asylum-seekers that the papers told him to check-in at the New York City ICE Field Office. *Id*. ¶ 6.

107.    Declarant Sokhona initially moved to New York City, where he attended his first ICE check-in. *Id*. ¶ 7. He later moved to Philadelphia and began working in a warehouse. *Id*. ¶ 8. He lived with a friend, with whom he split rent and utilities. *Id*. ¶ 8. Declarant Sokhona connected with the local Muslim community by attending prayers at two different mosques. *Id*. ¶ 9. He has made a number of friends and has been connecting to members of the Mauritanian diaspora, who

provide him with support. *Id*. He hired an attorney, who helped him apply for asylum in 2023. *Id*. ¶ 10. His attorney changed his ICE check-in location from New York City to Philadelphia, and Declarant Sokhona attended his next ICE check-in on September 3, 2025. *Id*.

108.   At this check-in, a security guard instructed Declarant Sokhona to go upstairs. *Id*. ¶ 11. He presented his documents to a woman sitting behind a desk. *Id*. After waiting for about 30 minutes, an ICE agent came out and took him into another room, and he was told that he was under arrest. *Id*. ¶¶ 11–12. ICE held Declarant Sokhona in custody at FDC Philadelphia for about one week, and then transferred to Moshannon, where he was held for several months. *Id*. ¶ 19. He was later transferred to Pike County Correctional Facility, where he remains detained. *Id*. ¶ 21.

109.   Declarant Balla Toure is a 33-year-old asylum seeker from Mauritania. Toure Decl. ¶ 2. As an active anti-slavery protestor, he faced persecution from the Mauritanian government. *Id*. ¶ 2. He entered the U.S. without inspection in 2023; shortly after crossing the border in Arizona, CBP detained him for two days. *Id*. ¶ 3. When he was released, CBP gave him a date for an ICE check-in later in 2023 and a first immigration court hearing in September 2024. *Id*. Declarant Toure moved to Philadelphia to live with his uncle and attended his first ICE check-in. *Id*. ¶ 4. After that check-in, he continued to check-in every three months. *Id*. He hired an immigration attorney who helped him timely apply for asylum and receive a work permit and social security card. *Id*. ¶¶ 4–5. Declarant Toure has worked hard to build a life in Philadelphia, finding employment at a bakery, securing housing, attending a mosque near his house, and purchasing a car. *Id*. ¶¶ 5–6. His immigration court date has been postponed twice but he has attended all ICE check-ins. *Id*. ¶ 7. On December 16, 2025, Declarant Toure was detained during a routine ICE check-in. *Id*. ¶¶ 8–10. He contacted his immigration attorney, who promptly filed a petition for habeas corpus, leading to Declarant Toure's release days later on December 19, 2025. *Id*. ¶¶ 10, 13. Since his release, he

has continued to attend his ICE check-ins but fears that he might be re-detained at his next appointment in September 2026. *Id*. ¶ 16. Despite this fear, he feels that he has no choice but to attend so that he can continue to move forward with his asylum case. *Id*.

110. Additional examples include a father of a two-year-old whose spouse was pregnant. He was re-detained despite being fully in compliance with the terms of his release. He struggled in detention and his wife and child "los[t] their stable home due to the loss of his income and support." Thompson Decl. ¶ 12. He was released pursuant to a habeas petition but "continues to suffer the trauma of [his] detention," "which lasted months." *Id*. Another example is an asylum seeker who had fully complied with his supervision requirements. *Id.* ¶ 10. After ICE arrested him, he began to cry and detention "resulted in him having memories and flashbacks of when he was imprisoned and tortured in Mauritania while in custody." *Id*. "He could not sleep because of these flashbacks and memories and became sick from anxiety and lack of appetite." *Id.* Yet another example is a person who is a political dissident from Nicaragua; he was re-detained at his fourth ICE check-in in October 2025. *Id.* ¶ 11. His detention resulted in being separated from "a sick family member whom he cared for and a job that he loved as a chef." *Id.* Detention also resulted in home having "flashbacks of the torture [he suffered] in custody in Nicaragua." *Id.* While all three people were ultimately released after they filed individual habeas petitions, they continue to feel the harmful effects of re-detention even after their release. *Id.* ¶¶ 10–12.

**F.     The Philadelphia Field Office has offered no reasoned explanation for its dramatic change in policy**

111. When the Philadelphia ICE Field Office rescinded the Changed Circumstances Policy, it provided no reasoned explanation for why it reversed course from decades of not re-arresting and re-detaining people absent an individualized assessment of flight risk or danger, and

certainly offered no explanation that attempted to address the reliance, due process, and Fourth Amendment interests at stake.

112.     When re-detaining people, ICE officers have failed to provide any explanation for the re-detention or a change in policy that led to it. Thompson Decl. ¶ 10 (When asked for an explanation about a client's re-detention at a check-in, an ICE agent responded that the reason for his detention "did not matter."); Campos Decl. ¶ 8; Gian-Grasso Decl. ¶ 13; Sokhona Decl. ¶ 15 (When noncitizen asked why ICE was re-detaining him, ICE told him it was simply because he "had to be in detention."). If explanations were provided, they were inconsistent. One immigration attorney was told her client was being re-detained despite no material change in circumstances because of the Executive Order about immigration enforcement priorities, which does not address re-detention or considerations for re-detention absent a material change in circumstances. Cambria Decl. ¶ 9. Another immigration attorney was told it was to facilitate a faster court hearing. Casazza Decl. ¶ 11. Other immigration attorneys were told it was because of the change in administration. Gian-Grasso Decl. ¶ 13; *see also* Thompson Decl. ¶ 11 (ICE told a client that the reason for his detention at a check-in was because "the previous president let in too many people and ICE now had to 'fix' this by detaining him."). A declarant was told, despite his previous release, that it was because of how entered the U.S. and that there was a "there was a law that said [he] could not be free anymore."). A.D. Decl. ¶ 14.

113.     In individual habeas cases involving petitioners who were re-detained by the Philadelphia ICE Field Office, the government asserted that it has categorical authority under the INA to re-arrest and re-detain *any* individual in pending removal proceedings without regard to *any* facts specific to the individual. That authority, they claimed, was based on their re-interpretation of the decades-old mandatory detention statute. *See e.g. Ndiaye v. Jamison*, No. CV

41

25-6007, 2025 WL 3229307, *2–7 (E.D. Pa. Nov. 19, 2025) (ordering release and rejecting that the government had authority to detain under 1225(b) pursuant to the July 8, 2026 memo/*Yajure Hurado* decision); *Salinas Jaigua v. Jamison*, No. CV 25-7115, 2025 WL 3757076, at *2 (E.D. Pa. Dec. 29, 2025) (same)*; Pak v. Hoover*, No. 3:26-CV-00379, 2026 WL 624165, at *5 (M.D. Pa. Mar. 5, 2026) (same)*; Nunez Ramos v. Noem*, No. 3:25-CV-00387, 2025 WL 3687335, at *3–4 (W.D. Pa. Dec. 19, 2025) (same).

114.     Indeed, the government claimed that—contrary to 30 years of statutory interpretation—§ 1225(b)(2), and not § 1226(a) applies to people in removal proceedings who entered without inspection, even those whom DHS itself had previously released from custody under the release mechanisms exclusive to § 1226(a). The government has argued that § 1225(b)(2) has always required the mandatory detention of people within the scope of this subsection.

### 1. The Government's Reinterpretation of 8 U.S.C. § 1225(b)(2)

115.     This drastic reinterpretation of § 1225(b)(2) stems from a DHS Interim Memo and a BIA decision.

116.     On July 8, 2025, DHS adopted a novel reinterpretation of the detention statutes. Breaking with decades of prior understanding, DHS "determined," in brief, unpublished guidance, "that section [1225] of the [INA], rather than section [1226], is the applicable immigration detention authority for all applicants for admission," including anyone who entered without inspection. U.S. Immigr. & Customs Enforcement, Interim Guidance Regarding Detention Authority for Applicants for Admission (Jul. 8, 2025), https://perma.cc/SNA2-XNSZ. DHS instructed that any noncitizen present in the United States without being admitted or paroled must be subject to mandatory detention under § 1225(b)(2), explaining that these "applicants for

admission" would now be "treated in the same manner that 'arriving aliens' have historically been treated." *Id.*

117.    But this July 8, 2025 interim memo also explicitly stated that the new "interpretation does not impose an affirmative requirement" for re-detentions. Instead, "re-detention of a previously released [non-citizen]" could be warranted "in a given case." *Id*. The interim memo also said "until additional guidance is issued, ERO and HSI should consult with OPLA prior to rearresting an alien on this basis." *Id*.

118.    Then, in September 2025, the BIA adopted the re-interpretation of § 1225(b)(2) in a published decision, *Matter of Yajure Hurtado*, 29 I.&N. Dec. 216 (BIA 2025). The BIA concluded that people arrested inside the country and who are present without admission or parole are subject to mandatory detention under § 1225(b)(2) and not bond-eligible under § 1226. *Id*. at 219, 228. As a result, the government is applying § 1225(b)(2) to people who have been living in the United States for years and apprehended anywhere within the country.

119.    Since late summer 2025, the Philadelphia ICE Field Office has relied on this new interpretation of § 1225(b)(2) as a justification for re-detaining people who entered the country without inspection, without regard to an individual's changed circumstances before deciding to re-detain them.

120.    This reinterpretation, however, ignores nearly 30 years in which § 1226(a) and § 1225(b)(2) have co-existed in the INA's statutory scheme, during which DHS has consistently deemed people who entered the country without inspection and were placed in Section 240 proceedings to be subject to § 1226(a).

121.    When DHS released someone who entered without inspection, it generally did so under § 1226(a)(2) and 8 C.F.R. § 236.1(b)(8). By definition, DHS released the members of the

Bond/RoR subclass—which includes Plaintiffs M.P.B. and Dianifaba—pursuant to its authority under § 1226(a) and its accompanying regulations. The documents DHS issued them during their initial detention repeatedly cite § 1226(a) as the statute governing their detention and classify them as already "present" in the country, rather than "arriving." They were at liberty in the interior of the country and in removal proceedings with DHS's explicit permission.

122.    DHS has also never revisited the interim regulation it issued in 1997 under § 1226(a), which clarified that the statute applied to the subset of "applicants for admission" who entered the U.S. without inspection. *See* 62 Fed. Reg. 10312, 10323 (Mar. 6, 1997). That subset of applicants for admission is categorically different from those covered by § 1225(b)(2), who are "seeking" admission—*i.e.*, actively attempting to effect a lawful entry into the country. Indeed, when Congress amended § 1226(a)'s companion provision, § 1226(c), this year, it included people who entered without inspection as subject to the new mandatory detention provisions—which would not have been necessary if they were already covered by § 1225(b)(2), as DHS now contends. *See* Laken Riley Act, Pub. L. No. 119-1, 139 Stat. 3 (2025); 8 U.S.C. § 1226(c)(1)(E).

123.    DHS' drastic reinterpretation of 8 U.S.C. § 1225(b) has led to a sharp increase in immigration habeas petitions. Some of the habeas petitions are brought by people who were re-arrested and re-detained without any individualized assessment of changed circumstances. Indeed, in a non-exhaustive review of habeas decisions available on WestLaw or LexisNexis, there have been at least 53 habeas cases involving 54 instances of re-detentions where, from the district court decision, it is clear that the petitioner had no change in their circumstances and yet they were re-detained. *See* Case Chart. But habeas petitions involving re-detention have largely resolved these petitions on the statutory claim of whether 8 U.S.C. § 1225(b) or § 1226(a) applies, meaning

Pennsylvania's three U.S. District Courts have generally not adjudicated claims about whether re-detention absent a material change in circumstances is unlawful.

124. Nor do these individual habeas petitions provide an adequate vehicle to challenge the Rescission of the Changed Circumstances Policy. Individual habeas petitions challenge the legality of present confinement and have largely been resolved on the statutory and due process claims about which detention statute applies.

125. But here, Plaintiffs are challenging the unlawful rescission of a policy prohibiting re-arrest and re-detention absent changed circumstances. This challenge, made by plaintiffs who are not currently detained, also includes plaintiffs who cannot be re-detained under § 1225(b): either because they were previously released by habeas court order finding that they could only be detained under § 1226(a) or because they do not fall under the government's expanded interpretation of § 1225(b), having previously been released from custody under § 1226(a) after having entered with inspection. So even if the government's expanded interpretation of § 1225(b) is found to be lawful, that alone cannot justify the Rescission of the Changed Circumstances Policy.

> **G.** **The drastic consequences of the Philadelphia ICE Field Office's Rescission of the Changed Circumstances Policy impose extraordinary and irreparable harm on Plaintiffs and the proposed class members**

126. Plaintiffs and proposed class members are suffering and will continue to suffer irreparable harm from the Philadelphia Field Office's Rescission of the Changed Circumstances Policy. Loss of liberty, consortium with children and families, employment, scholarships and housing are all irreparable harms that cannot be adequately compensated at law.

127. The results of the Rescission of the Changed Circumstances policy have been chaotic, cruel, and without any regard for DHS's prior consideration of an individual's flight risk

or danger to the community to justify re-detention. This wipes away decades of settled expectations. On information and belief, the Rescission of the Changed Circumstances Policy has resulted in the re-detention of more than 200 people in the Philadelphia Area of Responsibility, including Plaintiff Soumare. Casazza Decl. ¶ 5 (estimating his firm has handled habeas cases for about 190 people who were re-detained at ICE check-ins since September 2025 and that the vast majority who were re-detained had no material change in their circumstances); Thompson Decl. ¶¶ 10–14 (summarizing 21 client cases where the person was re-detained despite no material change in circumstances and stating that they are illustrative of dozens of other cases); Cambria ¶ 9; Campos Decl. ¶¶ 5, 8 (summarizing the common pattern of re-detentions he has seen and how many have occurred at check-ins at the Philadelphia ICE Field Office); Emelchin Brunner Decl. ¶ 13 (Over the course of just nine business days in May 2026, Asian Americans United has "supported 10 cases regarding someone re-detained at their ICE check-in in Philadelphia."); *see also* Case Chart (summarizing 54 instances from habeas cases filed in Pennsylvania District Courts that involve re-detentions by the Philadelphia ICE Field Office at ICE check-ins of people with no material changes in circumstances). Plaintiffs Soumare, M.P.B., and Dianifaba fear the same will happen to them at their upcoming check-ins. Soumare Decl. ¶ 39; M.P.B. Decl. ¶¶ 14–17; Dianifaba Decl. ¶¶ 18–19. These individuals have done everything the law requires of them: They have attended supervision check-ins and complied with various immigration administrative requirements. Yet they were re-arrested and re-detained, and/or face imminent re-arrest or re-detention.

128.    Plaintiffs and proposed class members face the immediate threat of being illegally re-arrested and re-detained indefinitely the next time they arrive at an ICE or ISAP office for a scheduled appointment or whenever they encounter ICE. Cambria Decl. ¶ 11; Casazza Decl. ¶ 13;

46

Thompson Decl. ¶ 18. They face the trauma of indefinite separation from their loved ones, including minor children. Campos Decl. ¶ 9 (describing how re-detentions result in people "being ripped away" from their family, including children and the emotional harm of this); Casazza Decl. ¶ 12 (describing how the children of the people who are re-detained are "deeply upset and distraught"); Cambria Decl. ¶¶ 12–13 (discussing how these re-detentions are "extremely traumatic and difficult" because they happen so suddenly that the parent does not have an opportunity to prepare their child for this painful separation); Thompson Decl. ¶¶ 12, 20 (providing an example of a person who was separated from their two year old daughter and discussing how re-detentions result in family separations). The lasting effects of the trauma of family separation on detained people, as well as their free loved ones, are well-known and well-documented.

129. Plaintiffs and proposed class members, fearing detention and/or family separation, are now experiencing deep emotional and psychological harm because of the Rescission of the Changed Circumstances Policy. They are experiencing anxiety and fear as they face the prospect of being ripped away from their families and losing their liberty as a consequence of going to a scheduled ICE or ISAP appointment and otherwise complying with their conditions of release or parole. Dianifaba Decl. ¶ 18; M.P.B. Decl. ¶ 17; Soumare Decl. ¶ 39; Toure Decl. ¶ 16.

130. Plaintiffs and proposed class members also face the terror of detention itself, *i.e.,* the loss of their liberty—potentially being locked up for weeks, months, or even years. Soumare Decl. ¶¶ 33, 39. *See also* Sokhona Decl. ¶¶ 21–23 (describing his detention for over eight months with no end in sight). They risk losing gainful employment and their schooling. A.D. Decl. ¶ 30; Casazza Decl. ¶ 12; M.P.B. Decl. ¶¶ 15–16; Soumare Decl. ¶ 39; Sokhona Decl. ¶ 21; Thompson Decl. ¶¶ 17, 20; Toure Decl. ¶ 18. They may lose their homes when the loss of their income makes it impossible for them or their loved ones to pay rent or mortgage payments. *See* A.D. Decl. ¶ 30;

47

Dianifaba Decl. ¶ 18; Sokhona Decl. ¶ 21. Indeed, proposed class members who have already been re-detained following the Rescission, have lost employment, housing, and healthcare. Thompson Decl. ¶¶ 11, 12, 20; Cambria Decl. ¶¶ 12, 16, 20.

131.   Plaintiffs and proposed class members also risk separation from their homes and communities if they are re-detained without individualized consideration and a finding of changed circumstances. Cambria Decl. ¶ 12; Dianifaba Decl. ¶ 19; Gian-Grasso Decl. ¶ 14; M.P.B. Decl. ¶¶ 16–17. They may be hastily transferred to detention facilities thousands of miles away from their loved ones, homes, and immigration attorneys, and the witnesses and documents that are key to their immigration cases. Cambria Decl. ¶ 18.

132.   Mr. Soumare experienced harm and hardship during his first re-detention, which took place in November 2025, and fears similar, continued harm if ICE chooses to re-detain him again. Soumare Decl. ¶¶ 28, 31–32, 37, 39. During his first re-detention, he felt unsafe and witnessed violence at one of the detention facilities. *Id*. ¶ 28. He lost a job that he had started just a few days before his check-in, leading to a month of lost wages at a time when Mr. Soumare incurred unexpected legal fees to challenge his unlawful detention. *Id*. ¶ 37. ICE also did not return Mr. Soumare's ID document, and he has not yet been able to obtain a replacement. *Id*.

133.   Mr. Soumare is anxious about the possibility of re-detention at his upcoming July 2026 check-in, and the ongoing malfunctioning of his ankle monitor. The order releasing him on habeas corpus only barred his re-detention by ICE for seven days. Soumare Decl. ¶¶ 35, 39; Order Granting Petition for Writ of Habeas Corpus, *Soumare v. Jamison*, No. 2:25-cv-06490 (E.D. Pa. Dec. 2, 2025). His family in Mauritania relies on him for money, and he will be unable to provide for them in detention. Soumare Decl. ¶ 39. He will also incur even more legal fees to once again seek his release. *Id*. ¶ 39. Even out of detention, he earns a modest income, and if he is re-detained

a second time, he will experience both significant economic hardship and other irreparable harms. *Id*. He also worries that the fast-tracked immigration court proceedings in detention will be more difficult to navigate. *Id*.

134.    Likewise, M.P.B. feels deep anxiety about the possibility of re-detention at his upcoming check-in in July 2026. M.P.B. Decl. ¶¶ 14–17. He is concerned that the life he has strived to build in Philadelphia will be taken from him and that his life will be turned upside-down. *Id*. ¶ 15. Administrators at the college he attends have confirmed that his scholarship will be forfeit if he must pause his studies, which would be inevitable if ICE re-detains him. *Id*. ¶ 16. He also will experience reputational harm if detained: he views his immigration status as a private matter, and fears that the relationships he has made in his community in Philadelphia will be harmed and that people will perceive him as a criminal, even as he has worked diligently to seek asylum in the United States. *Id*. ¶ 17. M.P.B.'s passion is helping others, as demonstrated through his employment at an immigrant-serving non-profit organization, extensive volunteer work, and student leadership. *Id*. ¶¶ 6, 9. He fears losing everything for which he has worked so hard. *Id*. ¶ 16–17.

135.    Similarly, Mr. Dianifaba feels fear and anxiety about the possibility of his re-detention. Dianifaba Decl. ¶¶ 18–19. After his roommate was detained at an ICE check-in last year (and remains in detention at the time of filing), Mr. Dianifaba lives in uncertainty about whether he might also be re-detained. *Id*. ¶¶ 13–14, 18. He has experienced health issues for which he required hospitalization prior to his April 2026 ICE check-in. *Id*. ¶ 15. He sleeps poorly at night and loses his appetite when he thinks of his next check-in, scheduled for October 2026. *Id*. ¶ 19. Should ICE re-detain Mr. Dianifaba at this check-in, he will be ripped from his community and from the children of his close friend, who view him as a father figure. *Id*. ¶¶ 7, 19. As a result, his

49

close friend will struggle balancing her work and school pick-up and drop-off for her children, and her children will miss him. *Id*. ¶ 19. Mr. Dianifaba will also suffer lost income, which will impact his ability to pay his share of rent—already increased after his roommate's detention—jeopardizing his housing. *Id*. ¶ 18. He also will be unable to send money back to Senegal to support his wife and young son. *See Id*. ¶ 9.

136.    The harms that have befallen plaintiffs are not the only ways that the Rescission of the Changed Circumstances Policy adversely impacts people who were re-detained at their ICE check-ins without an individualized determination of their changed circumstances.

137.    For example, Declarant A.D. was re-detained at an ICE check-in on September 8, 2025. A.D. Decl. ¶¶ 12, 14. While detained at FDC, his mental and physical health deteriorated. *Id*. ¶¶ 19–20. He struggled to sleep on the hard beds and was unable to eat. *Id*. ¶ 19. He filled out a form saying that he was experiencing a mental health crisis and that he needed to speak to a professional. *Id*. ¶ 20. However, he was not granted an appointment with a mental health professional. *Id*. He was later transferred to Moshannon, where his struggles continued. *Id*. ¶¶ 21, 23. The facility was overcrowded, the food was inedible, and the guards woke people up at all hours. *Id*. ¶ 23. His mental health continued to decline at Moshannon but he did not feel that he would receive care, so he kept his struggle to himself. *Id*. ¶ 22.

138.    Since being released in April 2026, ICE placed A.D. into an intensive supervision program. *Id*. ¶ 28. He must go to in-person check-ins every two months; show agents his living arrangements in the off-months; report his location every week; and not leave Pennsylvania, Delaware, or New Jersey. *Id*. He has struggled in other ways since being released: his credit score declined because he could not make payments in detention. A.D. Decl. ¶ 29. He also lost his job at the airport. *Id*. ¶ 30. A.D. experiences nightmares about his time in detention, and fears being

re-detained while he tries to rebuild his life. *Id*. ¶¶ 31, 33.

139.    Similarly, Declarant Demba Sokhona, who was re-detained in September 2025, and who remains in immigration detention at the time of this filing, has experienced substantial hardships as a result of his re-detention. Sokhona Decl. ¶¶ 11–13, 18–24. Because he has been detained for over eight months, he lost his job and income source. *Id*. ¶ 21. This means that he cannot contribute to the rent and bills that he splits with his roommate; as a result, his roommate is unsure if he will be able to keep the apartment. *Id*. As a result of persecution in Mauritania, Declarant Sokhona experiences severe dental pain. *Id*. ¶ 8. He was trying to address these issues prior to his re-detention but now is unable to do so; the only treatment he receives is over-the-counter painkillers. *Id*. ¶ 23. Because of crowding, he has gotten sick repeatedly and lost a lot of weight. *Id*. Declarant Sokhona, who came to the U.S. to escape enslavement, now finds himself caged once again despite having complied with all conditions of his initial release at the border and actively pursuing humanitarian immigration relief to allow him to continue to build a new life. *Id*. ¶¶ 22, 24.

140.    Additionally, Declarant Balla Toure faced harm and hardship as a result of his re-detention in December 2025. Toure Decl. ¶ 16. ICE did not return his social security card or drivers' license, and his phone—which worked at the time of his detention—was returned to him cracked and covered in ink. *Id*. ¶ 13. His detention caused a lot of stress to his family in Mauritania, and his father passed away just weeks after Declarant Toure was released. *Id*. ¶ 17. As a result, Declarant Toure had to mourn at the same time he was trying to rebuild his life. *Id*. ¶ 17. As a result of his re-detention, he lost his job (though he was eventually able to persuade his boss to take him back). *Id*. ¶ 18. He worries about being re-detained yet again at his September 2026 ICE check-in. *Id*. ¶ 16.

141.    Re-detention is also traumatic for people who are asylum seekers, as they "have been persecuted in their home countries," and "believe and trust in the system of the U.S. to not be like the countries in which they came from, where arbitrary and cruel actions by the government result in significant rights violations (and worse)." Thompson Decl. ¶ 20. For them, re-detention is "shocking." *Id.* ¶ 20. For example, for two asylum seekers—one from Nicaragua and one from Mauritania—their re-detention spurred painful memories about their experiences in their home countries, where they both were tortured while in government custody. *Id.* ¶¶ 10–11.

142.    Sudden re-detention also creates unnecessary havoc and other challenges. For example, "[w]hen [people] are detained unexpectedly, they leave behind children with no one to pick them up from school, cars stranded on the street because they are arrested with their keys." Thompson Decl. ¶ 17. Pets are suddenly left without anyone to take care of them. Cambria Decl. ¶ 14. People with medical conditions are re-detained without regard to their medical needs, resulting in a gap in their treatment. *Id.* ¶ 12; Thompson Decl. ¶ 12. Sick family members who rely on their loved ones to care for them are suddenly left without them. Thompson Decl. ¶ 11.

143.    Re-detention also strains legal representation, both because it requires immediate attention to file a federal habeas petition, *see* Cambria Decl. ¶¶ 18–19; Thompson Decl. ¶ 15, and also because the speed in which the detained immigration docket moves means cases proceed exceptionally quickly. Cambria Decl. ¶ 19; Gian-Grasso Decl. ¶ 15. Indeed, there is a multitude of challenges that people on the detained docket face, including the sheer speed of detained cases, which make it difficult for people to secure representation, and gather necessary evidence in support of their cases, such as expert reports, psychological reports, and documents from a foreign country. Morley Decl. ¶¶ 11–14. This in turn leads to immigration judges to make decisions on a "less than complete record as some of this critical evidence is not available in the time frame

52

allotted for the [detained] case to proceed to hearing." Morley Decl. ¶ 13; *see also id.* 11–14 (describing his experience with hearing detained cases as an immigration judge). It also places a particular strain on already scarce pro bono counsel for legal representation programs, who have to, in addition to managing their caseload, be prepared to expend additional resources both in advance of a potential re-detention and when a client suddenly re-detained. Cambria Decl. ¶ 17; Thompson Decl. ¶¶ 13–14. Some people also forfeit pursuing immigration relief as they feel "compelled to abandon" it after re-detention. Cambria Decl. ¶ 20.

## VI.    CLASS ACTION ALLEGATIONS

144.    Plaintiffs Soumare, M.P.B., and Dianifaba bring this class action on behalf of themselves and all others who are similarly situated pursuant to Federal Rules of Civil Procedure 23(a) and 23(b)(2).

145.    Plaintiffs seek certification of the following proposed Class and Subclass:

**Class:** (1) all noncitizens subject to re-arrest or re-detention by the Philadelphia ICE Field Office; (2) who have been or will be released from DHS custody; (3) are in removal proceedings under 8 U.S.C § 1229a, including any § 1229a proceedings that have been dismissed where the dismissal is not administratively final; and (4) are not subject to detention under 8 U.S.C. §1226(c) (the "Class") (the "Class").

**Bond/RoR Subclass:** All members of the Class whose release from DHS custody was or will be on bond, conditional parole, or their own recognizance under 8 U.S.C. § 1226(a) and/or 8 C.F.R. § 236.1(c)(8).

146.    The proposed Class and Subclass satisfy Rule 23(a)(1) because they are so numerous that joinder of all members is impracticable. On information and belief, Defendants have already subjected more than 200 people within the Philadelphia Area of Responsibility to unlawful re-arrests and re-detentions due to the Rescission of the Changed Circumstances Policy and will continue to do so on a widescale basis until and unless a court order prevents them from doing so.

147.    The proposed Class and Subclass satisfy Rule 23(a)(2) because there are multiple questions of law and fact common to all members of the proposed classes. Those common questions include, but are not limited to:

a.    Whether the Rescission of the Changed Circumstances Policy is arbitrary and capricious under the APA because Defendants failed to provide a reasoned explanation for the reversal of longstanding agency policy against re-arresting and re-detaining people absent an individualized determination that they have a material change of circumstances to justify re-detention. This includes whether it was arbitrary and capricious because: (1) Defendants failed to acknowledge departure from their previous policy; (2) Defendants failed to adequately consider important factors relevant to this decision, such as the reliance interest of individuals released from detention and the due process and Fourth Amendment implications that have arisen from the Rescission; and (3) Defendants relied on a factor that Congress did not intend it to consider, including the improper use of re-detention to pressure people to give up their claims for relief and self-deport;

b.    Whether the Rescission of the Changed Circumstances Policy is unlawful under the APA as "contrary to constitutional right" because it violates the Fourth Amendment's guarantee against unreasonable seizures.

148.    In addition to these questions common to the entire class, the Bond/RoR Subclass presents an additional question capable of resolution for all members of that Subclass:

a.    Whether the Rescission of the Changed Circumstances Policy violates the INA and exceeds Defendants' statutory authority under 8 U.S.C. § 1226(b).

149.    The proposed Class and Subclass satisfy Rule 23(a)(3) because the Named Plaintiffs' claims are typical of the claims of the class. Like the named Plaintiffs Soumare, M.P.B.,

54

and Dianifaba, each class member's claims arise from Defendants' Rescission of the Changed Circumstances Policy (and, thus, did not experience individual-specific reasons for their detention), and each class member has, accordingly, experienced or will experience the same primary injuries.

150.   The proposed Class and Subclass satisfy Rule 23(a)(4) because the proposed class representatives are committed to fairly and adequately defending the rights of all proposed class members. Named Plaintiffs seek the same relief as all members of the class, and their interests are not in conflict with the interests of the class. They have obtained counsel from the ACLU Foundation of Pennsylvania; Handley, Farah, & Anderson PLLC; Langer, Grogan & Diver, P.C., and Robert & Ethel Kennedy Human Rights Center, who have substantial experience litigating class action lawsuits and/or other complex federal litigation on behalf of noncitizens.

151.   The proposed Class and Subclass also satisfy Rule 23(b)(2) because Defendants have acted on grounds that apply generally to the class so that the relief sought is appropriate as to the class as a whole.

## VII.   CLAIMS FOR RELIEF

### FIRST CLAIM FOR RELIEF
### Violation of the Administrative Procedure Act, 5 U.S.C. § 706(2)(A)
### *Rescission of Changed Circumstances Policy is Arbitrary and Capricious*
### All Plaintiffs, Class, and Bond/RoR Subclass

152.   Plaintiffs repeat and re-allege the allegations contained in all preceding paragraphs of this Complaint as if fully set forth herein.

153.   The Administrative Procedure Act provides that courts "shall . . . hold unlawful and set aside agency action" that is "arbitrary [and] capricious, . . . or otherwise not in accordance with law" 5 U.S.C. § 706(2)(A).

55

154.    Defendants' Rescission of the Changed Circumstances Policy is a reviewable final agency action because it is neither tentative nor interlocutory, and legal consequences flow from the policy for Plaintiffs and the proposed Class and Subclass, who have been re-detained because of Defendants' Rescission of the Changed Circumstances Policy or who live in fear of being re-detained due to the Rescission of this policy in the future.

155.    The Rescission of the Changed Circumstances Policy departs from longstanding agency precedent, policy, and practice.

156.    In rescinding the Changed Circumstances Policy, Defendants provided no reasoned explanation, and therefore acted in an arbitrary and capricious manner, for at least three reasons. *See Encino Motorcars, LLC v. Navarro*, 579 U.S. 211, 222 (2016).

157.    First, Defendants failed to acknowledge their departure from this past policy, in fact they provided no explanation at all.

158.    Second, Defendants failed to consider important aspects of the problem, including serious reliance interests in the past policy and constitutional limitations on the government's authority to re-arrest and re-detain the proposed Class and Subclass members.

159.    Third, Defendants relied on factors Congress did not intend them to consider, including the improper use of re-detention to pressure people to abandon their claims for relief and self-deport.

160.    The Rescission of the Changed Circumstances Policy is therefore arbitrary and capricious in violation of the Administrative Procedure Act.

**SECOND CLAIM FOR RELIEF**
**Violation of the Administrative Procedure Act, 5 U.S.C. § 706(2)(B)**
*Rescission of Changed Circumstances Policy is Contrary to Constitutional Right*
**All Plaintiffs, Class, and Bond/RoR Subclass**

161.    Plaintiffs repeat and re-allege the allegations contained in the preceding paragraphs of this Petition as if fully set forth herein.

162.    The APA provides that courts "shall . . . hold unlawful and set aside agency action" that is "contrary to constitutional right." 5 U.S.C. § 706(2)(B).

163.    The Fourth Amendment protects the right of all persons present in the United States to be free from unreasonable seizures by government officials. Plaintiffs and members of the proposed class therefore have the right to be free from unreasonable seizures.

164.    As a corollary to that right, the Fourth Amendment prohibits re-arrest on the same charges/probable cause without a material change in circumstances.

165.    The Rescission of the Changed Circumstances Policy violates the Fourth Amendment because it authorizes immigration agents to undertake unreasonable seizures by re-arresting Plaintiffs and the proposed class members for the same civil immigration charges as their initial arrest without a material change in circumstances.

**THIRD CLAIM FOR RELIEF**
**Violation of the Administrative Procedure Act, 5 U.S.C. § 706(2)**
*Rescission of Changed Circumstances Policy Violates the INA*
**Plaintiffs M.P.B. and Dianifaba and the Bond/RoR Subclass**

166.    Plaintiffs repeat and re-allege the allegations contained in all preceding paragraphs of this Complaint as if fully set forth herein.

167.    Rescission of the Changed Circumstances Policy violates 8 U.S.C. § 1226(b) because the statute does not authorize re-detention without a material change in circumstances with respect to a noncitizen's flight risk or danger to the community based on an individualized

57

determination. Further, Defendants' re-interpretation of 8 U.S.C. § 1225(b)(2) and § 1226(a) is contrary to law and is not a valid legal basis for the Rescission.

168.    The Rescission of the Changed Circumstances Policy violates the Administrative Procedure Act because it is "not in accordance with law" and "in excess of statutory jurisdiction, authority, or limitations." 5 U.S.C. § 706(2)(A), (C).

## VIII.   PRAYER FOR RELIEF

Plaintiffs, on behalf of themselves and the members of the proposed classes, respectfully request that the Court grant the following relief:

a.    Grant class certification of the proposed Class and Subclass;

b.    Appoint the undersigned counsel to serve as class counsel pursuant to Fed. R. Civ. P. 23(g);

c.    Exercise the Court's authority under 5 U.S.C. § 705 to provide relief pending review of the Rescission of the Changed Circumstances Policy;

d.    Declare that the Rescission of the Changed Circumstances Policy is arbitrary and capricious, in excess of statutory authority, contrary to law, and contrary to constitutional right in violation of the APA;

e.    Vacate the Rescission of the Changed Circumstances Policy;

f.    Award Plaintiffs reasonable attorney's fees and costs; and

g.    Grant any other and further relief as the Court deems just and equitable, including individual injunctions when requested as necessary to secure the rights of class members.

DATED: June 24, 2026                              Respectfully submitted,


/s/ John J. Grogan
John J. Grogan (PA 72443)                    Vanessa L. Stine (PA 319569)
David Nagdeman (PA 327652)               Witold J. Walczak (PA 62976)

58

**LANGER GROGAN & DIVER P.C.**
1717 Arch Street, Suite 4020
Philadelphia, PA 19103
T: 215-320-5662
jgrogan@langergrogan.com
dnagdeman@langergrogan.com

Anthony Enriquez*
Sarah T. Gillman*
Sarah E. Decker*
**Robert & Ethel Kennedy Human Rights Center**
88 Pine Street, Suite 801
New York, NY 10005
T: (917) 941-9141
enriquez@kennedyhumanrights.org
gillman@kennedyhumanrights.org
decker@kennedyhumanright.org

*\* Admission for pro hac vice forthcoming*

Ali Szemanski (PA 327769)
Keith Armstrong (PA 334758)
Victoria Peña-Parr (PA 337924)
**AMERICAN CIVIL LIBERTIES FOUNDATION OF PENNSYLVANIA**

P.O. Box 60173
Philadelphia, PA 19102
T: 215-592-1513
vstine@aclupa.org
karmstrong@aclupa.org
vpena-parr@aclupa.org

P.O. Box 23058
Pittsburgh, PA 15222
T: 412-681-7864
vwalczak@aclupa.org
aszemanski@aclupa.org

Martha E. Guarnieri (PA 324454)
Matthew K. Handley*
Rachel Nadas*
Samantha Braver*
**HANDLEY FARAH & ANDERSON PLLC**

230 S. Broad Street, 17th Floor
Philadelphia, PA 19102
T: (215) 422-3478
mguarnieri@hfajustice.com

1050 Connecticut Avenue NW, Suite 500
Washington, DC 20001
T: (202) 899-2991
mhandley@hfajustice.com
rnadas@hfajustice.com

33 Irving Place
New York, NY 10003
T: (212) 843-9181
sbraver@hfajustice.com

59