# Exhibit G

## DECLARATION OF CHRISTOPHER M. CASAZZA
## IN SUPPORT OF PLAINTIFFS' MOTION TO STAY EFFECTIVE DATE OF AGENCY ACTION OR PRESERVE STATUS OR RIGHTS

I, **Christopher M. Casazza**, hereby declare pursuant to 28 U.S.C. § 1746:

1. I am a licensed attorney in the State of Pennsylvania. I am a Partner at the law firm Palladino, Isbell & Casazza in Philadelphia, Pennsylvania. We are a law firm consisting of sixteen attorneys and numerous support staff, dedicated solely to the area immigration law. Concurrent to my tenure at Palladino, Isbell & Casazza, I was an Adjunct Professor at Villanova University, Charles Widger School of Law in the Clinic for Asylum, Refugee & Emigrant Services (CARES). I also served on the Board of Directors of Justice for Our Neighbors, Delaware Valley (JFON-DV), a non-profit organization that offered free and low-cost immigration legal services to low-income immigrants and their families, and chaired the Board's Legal Operations Committee. I am a member in good standing of the State Bar of Pennsylvania. I am also in active/good standing in three Federal Circuit Courts, and 22 Federal District Courts.

2. I make this declaration based on my personal knowledge and, if called to testify about its contents, I could and would do so competently and truthfully.

3. I have practiced as an immigration attorney for 16 years in the State of Pennsylvania. Over the course of my career, I have represented or supervised the representation over 1000 clients in non-detained removal proceedings in immigration courts in the state of Pennsylvania. At any given time, our law firm collectively has approximately 700 active removal defense cases. My practice focuses primarily on removal defense (immigration court) and federal litigation, which often stems from removal defense. In my capacity as Partner, I directly oversee and supervise a team of three associate attorneys and two paralegals, and work closely with our firm's 'detained immigration' team, consisting of two associate attorneys and two paralegals, as a mentor. Consistent with the caseload of the law firm, the primary workload of my direct team includes removal defense, federal litigation, affirmative asylum applications, family-based immigration, and various humanitarian applications.

4. In the context of removal defense/immigration court, our firm represents individuals from all over the world in every aspect of removal defense. We represent recent arrivals, asylum seekers, withholding of removal and CAT claims, individuals applying for LPR or Non-LPR cancellation of removal, complex matters involving the immigration consequences of criminal convictions, adjustment of status (with and without waivers), Motions to Suppress, and various other nuanced or complex matters before the courts. We also represent individuals in those same matters before the Board of Immigration Appeals (BIA) and Circuit Courts.

5. Since September 5, 2025, to the date of the affidavit, my firm has filed and completed 235 habeas petitions and currently has another 58 active and pending. I am the leading federal litigator in my office, and I oversee all of the firm's federal litigation, including habeas petitions. Conservatively, I would estimate 65% of the 293 habeas actions we have filed since September 5, 2025, have involved people re-detained at ICE check-ins within the Philadelphia Field Office who are in active removal proceedings and/or do not have a final order of removal. The vast majority of our habeas cases involving re-detentions involved people who did not have any material change in circumstances, though because the courts did not focus on that aspect of our

1

clients' claims it was often not addressed. That said, I can only recall a few circumstances where ICE could have alleged a change in circumstances such as where an individual had their application denied by an immigration judge, and their case was now pending an appeal.

6. My firm has worked with individuals who were released or paroled into the United States pending removal proceedings because DHS had determined that they did not pose a danger to property or persons, and that they were likely to appear for any future proceedings (i.e. they were not a "flight risk"). And generally speaking, DHS was correct in their determinations to release these individuals – in my 16 year career I have had only one *in absentia* order of removal against a client; I am not aware of any other *in absentia* orders for clients of the Firm.

7. Prior to 2025, the Philadelphia Field Office did not re-detain our clients unless their individual circumstances materially changed in a way that ICE claimed made them a flight risk or danger to the community. Check-ins were routine and we would regularly advise clients that they did not need an attorney to accompany them to their appointments. ICE even streamlined the check-in process, installing automated kiosks for check-ins, permitting our clients to complete their check-in without even speaking to or seeing an ICE officer – similar to a self-check-out at a grocery store. To the extent that anyone was ever detained by ICE, it was almost always an individual who had a prior order of removal and ICE had obtained successfully obtained a travel document to effectuate the removal of that individual. It was unheard of to have a law-abiding individual in active removal proceedings without any changed circumstances be detained at a routine-check in.

8. In February 2025 this began to change and we started to see a few clients detained at check-ins. We thought this was odd, especially considering at that time, we would just file a motion for bond and get the client released.

9. Beginning in June/July 2025, I noticed an uptick in re-detentions (after the BIA's decision in *Matter of Q. Li*, 29 I. & N. Dec. 66 (BIA 2025) and the July 8, 2025 memo) and what I would describe as a surge in September after the BIA's decision in *Matter of Yajure Hurtado*, 29 I. & N. Dec. 216 (BIA 2025). I remember clearly on the afternoon of October 22, 2025, a lawyer from my firm returned from accompanying a client to ICE check-in during which the client was detained – the ICE officer, while taking the client into custody, remarked to the attorney "you know the situation" and asked "why is anyone showing up?" The officer was in essence conveying his disbelief that these individuals would dare step foot into the ICE office, when everyone knew they were going to be detained. This should emphasize the point that the ones being detained are the ones *who are not a flight risk.*

10. In our experience over the past several months, in cases where individuals are arrested at their ICE check-ins by the Philadelphia Field Office, they are primarily individuals with asylum applications pending in immigration court, who have attended their immigration court hearings, and who have complied with all requirements of their ICE supervision/check-ins. There are virtually no changed circumstances that would justify a recalibration of ICE/DHS's initial flight risk or danger analysis. In fact, we find that individuals who have changed circumstances (who have absconded from court, missed check-ins, have been arrested or had criminal contacts) are arrested in targeted ICE enforcement operations at their home or place of employment. But the individuals we are seeing being arrested at ICE check-ins are individuals who have been in

2

compliance with all their supervision requirements and have not had any changed circumstances, like a criminal arrest or conviction.

11. When the Philadelphia Field Office arrests and detains individuals at their check-ins, the individual is offered no explanation or justification for their detention. The only comment we have heard from the Philadelphia Field Office is that they are detaining the individual to make their case "go faster" – meaning, they are going to take them off the non-detained immigration court docket, and put them in the detained "rocket docket" where immigration judges have an drastically higher rate of ordering removal and are expected to complete their cases within two months. We have also had ICE Philadelphia Field Office officers tell individuals they only way they can get out is to "sue us" – meaning, they must file a habeas to get released.

12. The destruction that these check-ins leave in their wake is horrific and spreads wide. The immediate impact is obviously on the individual being detained (having their liberty ripped from them after they have followed all direction in lockstep) and the immediate family members, most often a spouse that depends on the detainee and children (very often U.S. citizens). Our office is inundated with repeated phone calls from loved ones desperate for the release of their family member because their main source of income has been cut off; and because their children are deeply upset and distraught due to their father's absence. After immediate family members, typically we hear from employers – they are generally also calling out of desperation, attesting to the strong work ethic and loyalty of the detainee, and offering support in any way to secure release. But some employers are not able to hold open positions indefinitely for workers who were unexpectedly detained and thus away from work. This means clients lose their jobs and even if they are released, have to look for other work. The stress and mental anguish this imparts on everyone is extreme and lasting; it is compounded by the fact that the detention comes as a surprise or shock – it is not something the detainee or the family is prepared for.

13. We have always advised our clients that they must follow the direction and orders of ICE/DHS, and that failure to do so will only negatively impact the outcome of their cases. Now, we must advise them that they must do this, but also, that in doing so there is an almost certain chance that they will be detained, and that ICE will seek to remove them from the United States as quickly as possible. It is a clear example of a catch-22. We frequently prepare habeas petitions before ICE check-ins, so that we can file them as quickly as possible once the client is inevitably detained; then without fail the habeas is granted and the client is either released or provided a bond hearing. But this ultimately is extra work—work that we now plan for, but work that has required that my firm focus additional resources and time to be able to represent clients in habeas proceedings.

14. The detention of these individuals – who do not present any changed circumstances that bear on flight risk or danger – serves no legitimate purpose. It detains and punishes those who are following the law and requirements imposed on them by ICE (even in the face of knowing that they will likely be detained) and it clogs the federal courts and U.S. Attorneys' offices. Having litigated cases in federal courts across the country for over a decade, *I know with certainty* that District Court Judges and U.S. Attorneys have *far* more important things to do than engage in this needless litigation. The drain on our communities and Judicial resources is significant, wasteful, and detrimental.

3

I declare under penalty of perjury that the foregoing is true and correct, and that this declaration was executed in Philadelphia, Pennsylvania, on June 18, 2026.

_____
Christopher M. Casazza