# Exhibit H

**DECLARATION OF BRIDGET CAMBRIA**
**IN SUPPORT OF PLAINTIFFS' MOTION TO STAY EFFECTIVE DATE OF AGENCY**
**ACTION OR PRESERVE STATUS OR RIGHTS**

I, Bridget Cambria, hereby declare pursuant to 28 U.S.C. § 1746:

1.  I make this declaration based on my personal knowledge and, if called to testify about its contents, I could and would do so competently and truthfully.

2.  I am the Executive Director of Aldea, which is a 501(c)(3) non-profit organization. Aldea provides free and low-cost legal services to immigrants across the United States, with a focus on Berks County, Pennsylvania. Our attorneys represent clients before USCIS, the Immigration Courts, the Board of Immigration Appeals, and federal courts. We work alongside local and national partners to connect our clients with health care, education, and community resources—ensuring both their rights and their well-being are protected.

3.  I am a licensed attorney and a member in good standing of the State Bar of Pennsylvania. I have practiced as an immigration attorney since 2006. Over the course of my career, I have represented or supervised the representation of thousands of clients in non-detained removal proceedings in immigration courts in the state of Pennsylvania.

4.  In my capacity as Executive Director of Aldea, I supervise a team of staff attorneys, paralegals, and support staff. My primary area of immigration practice is removal defense. Within removal defense, I focus on asylum and humanitarian applications. I also do family-based immigration petitions.

5.  For 20 years, I have represented noncitizens in Pennsylvania who were released pending removal proceedings because DHS had determined that they did not pose a danger to property or persons, and that they were likely to appear for any future proceedings.

6.  In my experience, prior to 2025, the ICE Philadelphia Field Office, did not have a practice of re-detaining our clients unless their individual circumstances materially changed in a way that ICE claimed made them a flight risk or danger to the community. I cannot recall a time from my 20 years of practice where I represented a client with an ICE or ISAP check-in within the Philadelphia Field Office who was re-detained absent a material change, like some kind of serious criminal contact, a removal order, or some other substantive change in their immigration proceeding.

7.  By the end of October/beginning of November 2025, Aldea began to receive requests for immigration habeas representation and started to file habeas cases, including for people who were re-detained despite no material change in their circumstances. Aldea has had to do this because it was the only way to get people out of detention.

8.  The re-detentions I am aware of follow a common pattern. The Philadelphia Field Office is arresting people that DHS had previously released on bond, own recognizance, or conditional parole under 8 U.S.C. § 1226(a) or humanitarian parole under 8 U.S.C. § 1182(d)(5), including people who used the CBPOne program. When people are released by DHS, that means there has

1

been a determination that detention is not necessary because a person is not a danger to the community and the government does not think the person is a flight risk such that detention is necessary.

9. A lot of the people I am aware of who have been re-detained have ICE check-in requirements, either at the ICE office or with ISAP. With these check-in requirements, I have seen that people are following what is asked of them. This means they have been going to the check-ins and have not had any criminal contacts. Despite this, ICE is arresting people who had been released or paroled without making individualized determinations that they are a flight risk or danger. The only reason I heard ICE give is the Executive Order, "Protecting the American People Against Invasion." This EO covers, among other things, ICE's enforcement priorities. While the EO broadened who is considered an enforcement priority, there is nothing in the EO justifying re-detaining people absent changed circumstances.

10. In my practice, I have seen so much harm happening from the Philadelphia Field Office's abandonment of their old policy of only re-arresting people who had a material change in their circumstances.

11. Before, our clients knew that if they followed what the Philadelphia Field Office asked of them, they would not be re-detained. It was a predictable and trusted process. Now, re-detentions happen suddenly and without regard to our clients' individual circumstances. The re-detentions are a terrible shock to clients. Our clients who have been previously released with supervision requirements usually have a signed document between them and DHS about their supervision terms. Our clients reasonably relied on the understanding that if they comply with those requirements, they will not be subject to re-detention.

12. In my practice, I have seen families appear for check-ins with ICE or ISAP where ICE separates intact families. Normally this means arresting the father/husband. For families where the father/husband is the primary income earner, this is especially hard, but even if both parents work, the sudden disappearance of one parent is extremely traumatic and difficult. Kids do not understand what happened to their parent – who never got to explain or prepare their children for this separation. In one client's case, ICE detained him without regard to his chronic (terminal) medical condition. He brought a letter from his doctor to the check-in appointment and they detained him anyway. He then had a gap in his treatment while detained, which impacted his health.

13. The harm to our clients are experiencing does not end even if they are released from detention, which right now has to be through individual habeas petitions. That is because ICE keeps people's documents, like their work permits, driver's licenses, and social security cards. This means they have to go through the process of getting a work permit again, which is costly and slow. And they might not be able to get another driver's license until they can get a new immigration document.

14. The re-detentions are done with no notice. One person who was detained got separated from their beloved dogs. There was no plan in place to take care of them because this was supposed to just be a routine check-in. After the person was abruptly detained, we had to help

2

them find someone else to care for their two dogs. Another person had their car impounded because they had it parked at the ICE office, and there was no one that could get their car when they were suddenly detained. Our clients just are not prepared for the upheaval of their lives because it is done without notice or cause—none of them had material changes in their circumstances.

15. Because the re-detentions happen suddenly, employers are left without notice from workers. I have had several employers contact our office asking for proof that a person is detained to excuse the absences detention causes. But even that is not necessarily enough to excuse absences, especially where re-detention continues for a longer period of time. Some of our clients have lost their jobs.

16. When our clients have been re-detained for longer period of time, the disruptions and harm continue. In addition to losing their jobs, I have had clients who have lost where they are living because they were re-detained.

17. It is also really hard for people to find immigration counsel and habeas counsel while they are in detention. Aldea receives many requests for legal assistance from detained individuals and the requests for representation far outweigh our bandwidth, which means we have to say no to people who desperately need help. There are not nearly enough pro bono services for people in ICE detention, which means people either have to be able to pay thousands of dollars to private counsel or go without legal help.

18. Because of all this, Aldea has been forced to change how we practice and how we assign resources. Now we have to advise our clients that they need to make a plan for detention and deportation before every check-in. This increases the amount of work for our non-profit. We have to do meetings and/or consultations beforehand to make sure people know their rights, have a plan for accompaniment, or ensure that they notify us or have someone ready to notify us immediately if they are detained. This is extra work for us, but it is critical to do. Also, if a client is detained, we must file a habeas petition as quickly as possible, which is a very significant strain on our attorneys' time. This is important because our client could be transferred out of a jurisdiction quickly from where we can practice. We are not admitted to district courts all around the country, so if the client is sent to a detention center where none of our attorneys are admitted, we either have to find local counsel (which is hard to do on a pro bono basis) or not file the habeas at all.

19. This shift has also disrupted—and continues to disrupt— Aldea's legal representation and our clients' substantive immigration cases. Detention significantly interferes with a person's ability to help prove their case because everything is accelerated. In my experience, clients who are detained are given very little time before their hearing. When someone is not detained, we have a hearing date that has been scheduled. Sometimes that is months, or even a year or more, from now. In that time, we, with our client, work on putting together the merits of their case. But it can take time to get documents from witnesses – especially if they are abroad. It also takes time to get expert reports, which are from psychologists or country condition experts. When someone is detained, we now have just weeks to get everything together. I have seen from my detained practice a clear acceleration in how quickly detained cases are being moved, which I

3

understand is due to directives by the federal administration to immigration judges to move cases even more quickly than they had been. The rush hampers our ability to make the best case possible for our clients. The reality is that there is just no way to get everything we would want to include in a case together in time when someone is detained and has such a short timeframe before their hearing.

20. I have witnessed the lasting and harmful impacts this change is having on our clients. Some are compelled to abandon their pursuit of immigration relief. Those with families here in the U.S. are separated from them without any warning or time to prepare. Those families then suffer financially when one of the parents is suddenly detained. Our clients are already a vulnerable population – a population of mostly asylum seekers who came to the U.S. seeking safety. Re-detaining people despite no material change in their circumstances completely disrupts their life and is nonsensical. Our clients are going through the immigration process and doing all that the government has asked of them. While they do that, they are contributing to their communities and building lives here. Our clients work in industries that we all use—they pack our online orders so that they can be quickly shipped to our homes, they process poultry and meat that ends up in our local restaurants and grocery stores, and they care for the elderly as home healthcare workers.

21. In addition to providing direct representation to individual clients, Aldea also serves the immigrant community in other ways, including through legal clinics and other community events. It is through these events that I have become aware of how the re-detentions are impacting people beyond our clients. People are scared and some people are much more reticent to attend their own check ins.

I declare under penalty of perjury that the foregoing is true and correct, and that this declaration was executed in Reading, Pennsylvania, on June 10, 2026.

_____
Bridget Cambria

4