# Exhibit J

**DECLARATION OF BRENNAN GIAN-GRASSO
IN SUPPORT OF PLAINTIFFS' MOTION TO STAY EFFECTIVE DATE OF AGENCY
ACTION OR PRESERVE STATUS OR RIGHTS**

I, Brennan Gian-Grasso, hereby declare pursuant to 28 U.S.C. § 1746:

1.  I am a licensed attorney in the State of Pennsylvania. I am the Founding Partner at GT Immigration Law Group. I am a member in good standing of the State Bar of Pennsylvania.

2.  I make this declaration based on my personal knowledge and, if called to testify about its contents, I could and would do so competently and truthfully.

3.  I have practiced as an immigration attorney for 16 years in the State of Pennsylvania. Over the course of my career, I have represented or supervised the representation of thousands of clients in removal proceedings in immigration courts in the State of Pennsylvania and in affirmative applications before United States and Citizenship Services (USCIS).

4.  My primary practice focus has been on removal defense in both the detained and non-detained contexts, including deportation defense, litigation and appellate work at the Board of Immigration Appeals. I have successfully litigated cases before the Immigration Court (EOIR) in Philadelphia, New Jersey,[1] New York, Baltimore and Orlando. I also have won cases at the Board of Immigration Appeals and the United States Court of Appeals for the Third Circuit.

5.  For clients who are not detained, they have hearings on the non-detained immigration docket. For a case to be on the non-detained docket, it is either because it was a referral from United States and Citizenship Services (USCIS) or is a case where the person had been arrested and detained by DHS and then released after a determination that they did not pose such a flight risk that detention was necessary and were not a danger such that they had to be detained during the pendency of their removal case. This second group includes people who were arrested at or near the border and then released.

6.  I handle various types of immigration litigation, including cancellation of removal for lawful permanent residents and non-permanent residents, adjustment of status, waivers of inadmissibility for both fraud and criminal activity, asylum, withholding of removal and requests for prosecutorial discretion. In the detained setting, I am experienced in obtaining bond and parole for clients. I also represent individuals in non-typical immigration litigation, using strategies such as motions to suppress in the Immigration Court context to challenge the aggressive enforcement policies of Immigration and Customs Enforcement (ICE) that affect immigrant families throughout our community.

7.  In addition to the litigation-based removal practice, I represent individuals and families applying for affirmative benefits with U.S. Citizenship & Immigration Services (USCIS). Some

---

[1] EOIR in Elizabeth, New Jersey, is the immigration court that hears cases for people in ICE detention in Pennsylvania.

1

applications include family-based I-130 Petitions, Adjustment of Status, Special Immigrant Juvenile Petitions (SIJ), VAWA Petitions for Victims of Domestic Violence, U Visa Petitions for crime victims, Naturalization and Certificates of Citizenship, Consular Processing, Fiancé Visas, Deferred Action for Childhood Arrivals (DACA), and Temporary Protected Status (TPS).

8.   I am also a legal adviser to the Mexican Consulate in Philadelphia, providing consultations to detained and non-detained Mexican nationals, as well as direct representation in removal proceedings and affirmative applications.

9.   For 16 years, I have represented noncitizens in Pennsylvania who were released pending removal proceedings because DHS had determined that they did not pose a danger to property or persons, and that they were likely to appear for any future proceedings.

10. Prior to 2025, the Philadelphia Field Office generally required a material change in individual circumstances that indicated new flight risk or danger before re-arresting someone DHS had previously released. Under this policy, I typically saw check-ins used not to re-detain people but simply to remind people to attend their immigration court hearing. I often saw ICE discontinue the in-person check-in requirement after a few check-ins, or sometimes after just one check-in. Generally, if check-in requirements were discontinued, that was it. There were not other supervision requirements that they were put on. I also generally did not see clients being re-detained for minor infractions like a late or missed appointment or if they had a geographic limitation and accidentally went beyond it. These were not seen as a basis for re-detention.

11. Throughout my 16 years of representing clients with ICE check-ins at the Philadelphia Field Office, I cannot recall ever having had a client who was re-detained absent a material change in their circumstances. This was true of clients who had been released on bond, on their own recognizance, on conditional parole under 8 U.S.C. § 1226(a)(2)(B), or on humanitarian parole under 8 U.S.C. § 1182(d)(5). This was true also of clients who were paroled under 8 U.S.C. § 1182(d)(5) after using CBPOne.

12. Based on my experience with clients, I saw a ramp up of re-detentions despite no material change in circumstances beginning in July 2025. These re-detentions have unfortunately continued since then and it is clear from my clients' experiences that the Philadelphia Field Office has abandoned their previous policy of not re-detaining people absent a material change in circumstances.

13. The re-detentions follow a common pattern. They are of people who were: (1) previously released by the DHS (either ICE or CBP) after (a) a determination they are not a danger to people or property or a flight risk or (b) who had been paroled through CBPOne and released, meaning DHS made a danger and flight risk analysis; (2) they have been complying with any check-in requirements, meaning no criminal contacts or changes in their circumstances and went to their check-ins; (3) they have been going to their immigration court proceedings, and timely filed applications for relief; and (4) they were re-arrested and re-detained by ICE without ICE making any individualized determination that they are a danger or flight risk. Most of the time, ICE did not give a reason for the re-detention or said the immigration enforcement priorities changed or because of a change in administration.

2

14. My clients have faced and continue to face so much harm from the Philadelphia Field Office abandoning their prior policy of not re-detaining people absent a change in material circumstances. They are separated from their family and loved ones, which often includes their young children. In the immediate term, the sudden and unexpected detention is extremely disruptive and jarring. Family members do not know what happened to their loved one or where they are detained. For parents, they have to figure out childcare, as one parent is taken away completely unexpectedly. People who are detained lose their jobs, which has a profound impact on their family, as they are often the primary income earner. It is also the sudden, unexpected re-detention that is particularly jarring and harmful. There is no warning, it just happens. And when it happens at an ICE check-in, where ICE requires them to go to in order to comply with the terms of their release, that is particularly egregious. They are there complying with what is being asked of them and yet they are re-detained without any regard to whether they have had a material change in their circumstances.

15. Detention vastly complicates case preparation and the protection of my clients' rights. I see this both for asylum seekers and for people who are longtime residents seeking relief through non-lawful permanent resident cancellation of removal. While detained cases have always been more difficult, they are harder now because, at the same time that re-detentions picked up, the administration also made it harder to litigate and defend against removal. First, they sped up the timeline for the person's substantive hearing (akin to trial, and called either a merits or individual hearing). People are getting scheduled for merits hearings two to three weeks after they are detained. It is incredibly difficult for detained individuals—even with the help of immigration counsel—to be prepared to go to trial in just two or three weeks to present their full immigration case. This is very quick compared to just a few years ago where merits hearings were scheduled a few months after a person was detained.

16. Detention also severely inhibits my clients' ability to pursue their claims for relief and/or defense against removal. This includes my asylum seeker clients, many of them have suffered significant trauma. While they have timely filed for asylum, that does not mean their case is fully presented and ready for adjudication. The practice for non-detained asylum cases is that you timely file for asylum (within one year after their entry) and then, closer to the merits hearing, you submit your brief with supporting evidence, which is normally quite detailed and voluminous. It often includes psychological evaluations to contextualize the trauma and harm the person experienced. If they are a torture survivor, it may also include a medical evaluation to document injuries. The filing also includes country conditions and other evidence, sometimes in the form of declarations from country conditions experts or witnesses. This evidence takes time to put together, and for clients who have recently arrived, sometimes the cost of a psychological evaluation, while important, is one that they are working on being able to cover. But clients are operating on the timeline the government gave them after they were released: they are on a non-detained docket with a court date that has been scheduled sometime in the next few years. They are planning their case and their lives around this future scheduled hearing, saving money to pay for legal representation or other costs for their case, along with supporting themselves and their loved ones.

17. When a client detained, they now risk being subjected to what are known as pre-terminations. This means a person never gets their day in court to present their asylum claim or

non-lawful permanent resident cancellation of removal. Instead, the government moves for pre-termination, normally through an oral motion the day of the merits hearing. To do this, the government has agreements, called Asylum Cooperative Agreements (ACAs), with third countries where, allegedly, the client will get the same process as here. In order for these ACAs to have been entered into, there is supposed to be some kind of finding that countries actually have the ability to do this. But none of that is actually presented in immigration court. Instead, immigration judges are basically accepting these as they say they cannot second guess the Department of State for making them or that they do not have jurisdiction to second guess it. When ACAs are brought up in the detained removal case, all of this is happening extremely fast. Often the government attorney raises this the day of the hearing, and then as immigration counsel, I am given a very short window to respond, or sometimes told by the Immigration Judge I can respond but they are inclined to grant the motion to pre-terminate.

18. Further, my clients cannot get review of their custody without filing a federal petition for habeas corpus. This takes a lot of resources and of course is an additional cost to the client, who must pay for habeas representation separate from legal counsel on their immigration case.

19. The change has had a profound impact on my clients. I can no longer advise clients who were previously released by DHS that they will not be re-detained by the Philadelphia Field Office at their check-ins or elsewhere within the Philadelphia Field Office's Area of Responsibility absent changed circumstances. Instead, I advise them that the Philadelphia Field Office abandoned their old policy of not re-detaining people absent a material change in their circumstances. I have clients who are scared to go to their check-in. We prepare our clients for the possibility of re-detention at an ICE check-in now and advise about having a habeas plan in place as well. But it is hard for clients to grapple with, when they have been doing all that has been asked of them by the government since they came to the U.S, since the same federal agency that previously released them and told them to follow their check-in requirements to stay out of detention are now using check-ins to re-detain them.

I declare under penalty of perjury that the foregoing is true and correct, and that this declaration was executed in Philadelphia, Pennsylvania, on June 22, 2026.

Brennan Gian-Grasso