# Exhibit K

**DECLARATION OF THE STEVEN A. MORLEY
IN SUPPORT OF PLAINTIFFS' MOTION TO STAY EFFECTIVE DATE OF AGENCY
ACTION OR PRESERVE STATUS OR RIGHTS**

I, Steven A. Morley, hereby declare pursuant to 28 U.S.C. § 1746:

1.  I am a licensed attorney in the state of Pennsylvania. I am a member in good standing of the State Bar of Pennsylvania and have been since 1976. I have worked in the immigration law field for 40 years. First, for 25 years in private practice, then as an Immigration Judge for nearly 12 years, and since 2022, as Of Counsel at the immigration law firm, Simon, Choi & Tuohy.

2.  In addition, I was an editor of the American Immigration Lawyer's Association's Immigration & Nationality Handbook for many years, and I am the author of the chapter on Immigration Appeals in the Third Circuit Appellate Practice Manual (PBI). I frequently lectured on immigration matters. I was Chapter Chair of the Philadelphia Chapter of the American Immigration Lawyers Association (AILA) and was appointed to two terms on the national AILA/Executive Office of Immigration Review (EOIR) Liaison Committee. I served as Chair of the Criminal Justice Section of the Philadelphia Bar Association and served for more than a decade on the Board of Directors of HIAS Pennsylvania (Hebrew Immigrant Aid Society), including a term as the HIAS Board President.

3.  I have been an adjunct professor at the Thomas R. Kline School of Law of Drexel University where I taught Immigration Law, Refugee & Asylum Law, Immigration Litigation and Sentencing Law. I also taught at Villanova Law School and Rutgers-Camden Law School, and in the paralegal program at Community College of Philadelphia.

4.  I make this declaration based on my personal knowledge and, if called to testify about its contents, I could and would do so competently and truthfully.

5.  I started practicing law at the Defender Association of Philadelphia in 1976, first in the state court division and then in the federal court division. I entered private practice in 1983.

6.  I started doing immigration cases in 1985 in private practice. Back then, Philadelphia did not have its own immigration court and judges from the Baltimore Immigration Court were detailed to Philadelphia to hear cases several times a year. Most of the time, when a client was detained and there was a question of bond, the immigration agency at the time (called Immigration and Naturalization Service, or INS), would release the person on a bond amount. Sometimes release would involve negotiating with the district director to find an appropriate amount. I do not recall doing any hearings (bond or merits hearings) for detained cases at all as the number of detained cases was very small.

7.  Starting in the 1990s, I began to do more detained immigration cases, especially after INS employed York County Prison as a detention facility and the immigration court opened there. Philadelphia's immigration court (EOIR) also opened up in 1995, which heard non-detained cases.

1

8.   In my 25 years of private practice before becoming an Immigration Judge, apart from one case where a person was taken back into ICE custody after being indicted on federal criminal charges, I do not recall having any cases where I represented someone who had been released on bond or released on their own recognizance and was then taken back into custody. I also do not recall hearing from my colleagues about clients of theirs who, once released, were taken back into custody without a material change in their circumstances. I also do not recall an instance where someone who had been paroled was then later put into immigration detention without some material change in their circumstance.

9.   In December 2010, I was appointed by then Attorney General Eric Holder to become an Immigration Judge. I served as an Immigration Judge at the Philadelphia Immigration Court until my retirement from the bench in July 2022. As an Immigration Judge, I adjudicated a wide variety of applications for relief from removal and rendered written and oral decisions on complex questions of immigration law. I also served as an adjudicating official for attorney disciplinary matters brought by EOIR.

10. When I became a Judge in 2010, I sat in a court that exclusively handled non-detained cases. It was a fairly regular occurrence for people who had previously been released on bond, conditional parole, parole, or on their own recognizance to be added to my docket. I do not recall any circumstance from 2010 to the middle of 2022, which is my full tenure as an Immigration Judge, of someone being re-detained and being taken off my docket. It just was not an occurrence during my time as an Immigration Judge, which spanned three federal administrations—Obama, the first Trump term, and Biden. If there was a re-detention, it was because of some other issue, like a new contact with criminal enforcement; such re-detentions were not regular occurrences.

11. While most of my experience as an Immigration Judge was on a non-detained docket, I was detailed to hear detained cases for about a total of eight to ten weeks during my tenure to immigration courts at York County Prison, Houston, and Chicago. It is from this experience that I can speak to the difficulties people in ICE detention face in presenting their immigration cases.

12. First, I saw that once detained, far fewer people can put together the resources to retain an attorney. As an Immigration Judge, I would hear where the government is represented by a professional, an attorney, and then the respondent, the non-citizen, is pro se. As an Immigration Judge, I tried to make sure the respondents' rights were protected. But it was difficult. I was— and still am—aware that far fewer detained pro se respondents are successful in securing relief from removal. And that makes sense. Lawyers know how to advocate, it is their job to marshal facts and present persuasive case arguments. Pro se respondents are ill equipped to do that, especially in a complex area of law. The speed in which detained dockets move also impacts the non-citizen's ability to obtain an attorney.

13. Second, in addition to the speed of detained dockets impacting a person's ability to obtain an attorney, the speed also precludes non-citizens from being able to present all the evidence that should be before the court. For example, expert reports, psychological reports, documents from a foreign country that could corroborate a claim are all incredibly helpful. But, because of the pressure to move cases quickly, Immigration Judges on the detained docket are making decisions on a less than complete record as some of this critical evidence is not available in the time frame

2

allotted for the case to proceed to hearing. Considering the stakes at issue, this is not a way to run a justice system. Immigration Judges regularly must decide cases knowing that there is available evidence that has not been presented because of the pressure from EOIR, which is part of the U.S. Department of Justice, to hold the final hearing. Detained cases are expected to move quickly. This meant cases nevertheless went forward on a less than complete record even though more time would be beneficial for the respondent (noncitizen) to prepare their case and marshal important evidence.

14. These are the downsides that people who are detained face—the lack of counsel and lack of time and opportunity to secure crucial evidence yielding decisions on a less than complete record. Conversely, when not confronting the time pressure of a detained docket, as an Immigration Judge, I saw how giving non-citizens time to find an attorney or gather additional evidence was ultimately helpful in my ability to hear and adjudicate cases correctly.

15. I have been Of Counsel at Simon, Choi & Tuohy since 2022. In the last 15 months, since President Trump took office, attorneys at the firm have begun to accompany clients to their ICE check-ins. This was not done in the past. I have also spoken with other local immigration attorneys, who, like the attorneys at Simon, Choi & Tuohy, understand that ICE check-ins are no longer the routine, risk-free matter they used to be. Instead, they are fraught with the possibility of re-detention despite no material change in circumstances. This obviously puts a strain on the resources of attorneys and thus on the cost associated with retaining an attorney in this vital area of the law. Thus, the consequences of being re-detained are severe and impact the likelihood of an individual mounting as successful defense to removal.

I declare under penalty of perjury that the foregoing is true and correct, and that this declaration was executed in Philadelphia, Pennsylvania, on May 21, 2026.

Steven A. Morley

3