# Exhibit L

**DECLARATION OF LILAH R. THOMPSON
IN SUPPORT OF PLAINTIFFS' MOTION TO STAY EFFECTIVE DATE OF AGENCY
ACTION OR PRESERVE STATUS OR RIGHTS**

I, LILAH R. THOMPSON, hereby declare pursuant to 28 U.S.C. § 1746:

1. I am a licensed attorney in the state of Pennsylvania. I am the Chief of the Community Defense Unit (Immigration Legal Practice) at the Defender Association of Philadelphia. Previously, I served as Supervising Attorney of the Pennsylvania Immigrant Family Unity Project (PAIFUP) at the Nationalities Service Center (NSC), a nonprofit legal service and refugee resettlement agency in Philadelphia, Pennsylvania. PAIFUP is Pennsylvania's only publicly funded pro bono defense counsel program representing noncitizens in detention. For the past six years, I have provided and supervised *pro bono* representation of individuals in removal proceedings before the Executive Office for Immigration Review (EOIR), with a focus on individuals in immigration detention. I am a member in good standing of the State Bar of Pennsylvania.

2. I make this declaration based on my personal knowledge and, if called to testify about its contents, I could and would do so competently and truthfully.

3. I have practiced as an immigration attorney for six (6) years in the state of Pennsylvania. Prior to practicing law in Pennsylvania, I completed a two-year clerkship with the Executive Office of Immigration Review (EOIR) at the New York Immigration Courts, which heard both detained and non-detained cases. I then transferred to be an attorney advisor with the Philadelphia Immigration Court, where I worked for the judges on the non-detained docket in Philadelphia and the detained docket in York, PA for six months. Over the course of my career, I have represented or supervised the representation in approximately one hundred and fifty (150) clients in detained and non-detained removal proceedings in immigration courts and before the Board of Immigration Appeals. In my capacity as the Chief of the Community Defense Unit and formerly as the Supervising Attorney at NSC, I have been supervising the attorneys in our program in their representation of detained clients. My primary responsibilities include providing *pro bono* representation to noncitizens with ties to Philadelphia and the surrounding counties. I also supervise each of our attorneys in their representation of individuals in removal proceedings and other matters, including petitions for writ of habeas corpus. I have supervised the filing of over one hundred (100) habeas petitions since December of 2025. Since 2020, I have also served as the Chair of the EOIR Liaison Committee for the Philadelphia Chapter of the American Immigration Lawyer's Association (AILA).

4. Our program provides *pro bono* representation to noncitizens detained by ICE and continues that representation if individuals are released from custody. We also provide representation for our clients at mandatory ICE check-ins, accompanying them as they meet with ICE every three to six months, or every year or at a date and time that ICE requires our clients to check-in. Our program has been accompanying clients to ICE check-ins since 2020.

1

5.   In addition to direct legal representation, our program also regularly conducted Know Your Rights training. As part of this work, my team reviewed paperwork and reporting requirements for over 300 people.

6.   From 2022 until 2024, my colleagues and I regularly accompanied both clients and *pro se* individuals to their ICE check-ins at the Philadelphia Field Office or Alternatives to Detention (ATD) appointments under ISAP. Typically, we would attend the first check-in with a client or *pro se* individual so they could gain familiarity with the process, and thereafter they would attend these appointments without us. Certain clients, like those who speak rare languages or have other vulnerabilities, would request more frequent accompaniment, which we would provide, as needed. The majority of the clients and *pro se* individuals we accompanied were in or pending active immigration removal proceedings and were in compliance with their ICE check-ins or supervision (including alternatives to detention reporting requirements). Usually, they were individuals that DHS had previously released—whether on bond, on their own recognizance, or on parole. In my experience, none of the individuals in this group were detained absent a material change in their circumstances. They could count on the fact that complying with their supervision meant they would not be re-detained and they went about their lives accordingly.

7.   However, beginning in the summer of 2025—in approximately June—I observed that ICE began to increase the frequency of the reporting requirements and began detaining individuals at their ICE check-ins within the Philadelphia Field Office's Area of Responsibility. The individuals who were being detained were the same population of people that were not being detained previously and were not required to check-in more than once a year.  All of the sudden, the Philadelphia Field Office began to require people to check-in every six months and at those appointments they were almost always detained, though nothing in their cases had changed. Meaning, they were still in removal proceedings and did not have any changed circumstances, like a new criminal contact. They were not given any prior notice that they were going to be detained. I also saw a shift in how the kiosk check-in system was used. Before, most people would check in at the kiosk and receive a printout informing them to return in a year. That was the extent of their check-in. However, I saw shift where most people were required to go upstairs after they completed the kiosk check-in, even people who had no material change in their circumstances.

8.   Because I had heard of increased detention at check-ins, our attorneys began accompanying all of our existing clients to their ICE check-ins and began alerting me about this change. Because there are often many individuals checking in with the Philadelphia Field Office at the same time, the attorneys in our program also observe what happens to individuals who have no representation and report that information back to me. Additionally, because I am a liaison with the Immigration Court for the Philadelphia Chapter of (AILA) and run a *pro bono* program, I am in frequent—often daily—communications about detentions of community members that my office does not represent, so I am able to observe trends of detention for our clients, *pro se* individuals, and those represented by private counsel.

**ICE Re-Detention Without Changed Circumstances**

9.  As is set above, the Philadelphia Field Office is now re-arresting and re-detaining people who were previously found to not be a danger to the community or a flight risk. They are

individuals who are going through their immigration removal proceedings and pursuing applications through the U.S. Citizenship and Immigration Services (USCIS) or EOIR. The re-detentions are done regardless of whether an individual has a pending case for relief before EOIR or USCIS. ICE officers often informed our attorneys that the reason for a client or *pro se* individual's detention was due to the change in administration, and not because our client violated any conditions of release.

10. One of our first clients who was detained in the summer of 2025 is an asylum seeker from Mauritania who came to the United States after being beaten, tortured, threatened, imprisoned, and nearly murdered for being gay. We began representing him in February of 2024. He already had a pending immigration removal case where he had timely filed an asylum application and was compliant with his yearly ICE check-ins. His attorney, who I supervised, attended both of his ICE check-ins with him that were held in 2025 at the Philadelphia Field Office. At his June 2025 check-in, he was ordered to return in October 2025, instead of June 2026 which would have been a year later. At this October 2025 check-in, he was promptly detained by ICE, despite no changes in his immigration or other circumstances. When an explanation was sought in light of there having been no change in his circumstance, the only answer given was that that "did not matter." Our client began to cry as he was taken away into ICE's custody. Being in ICE detention was particularly traumatizing for him. He felt like he was being treated as a criminal, though he had done nothing wrong. He tried to show the ICE officers the scars from being tortured in Mauritania, but they did not care. His custody resulted in him having memories and flashbacks of when he was imprisoned and tortured in Mauritania while in custody. He could not sleep because of these flashbacks and memories and became sick from anxiety and lack of appetite.

11. This account is like so the dozens of others I am aware of. Another client of ours was detained in October of 2025, similarly attending his yearly ICE check-in with the Philadelphia Field Office. He is a political dissident who was detained and tortured in Nicaragua because he opposed the government. He came to the United States, turned himself in at the border, and timely sought asylum. He diligently complied with his ICE check-ins, never once missing an appointment. Though he had heard that individuals were being detained at ICE check-ins, he still insisted on going. Yet, at his October 2025 check-in—his fourth check-in—ICE detained him and subjected him to purported mandatory custody. He similarly asked for an explanation as to why he was being detained when he had always complied with his check-ins and had a pending asylum application. He was told that the previous president let in too many people and ICE now had to "fix" this by detaining him. He spent months in ICE custody, which took him away from a sick family member whom he cared for and a job that he loved as a chef. He similarly began having flashbacks of the torture in custody in Nicaragua. We successfully obtained his release through a federal habeas petition but the suffering he experienced from being re-detained despite no material change in his circumstances was significant.

12. Another client of ours was detained in November of 2025, when he went to an ICE check-in, accompanied by his two-year old daughter and his pregnant spouse. He reported to the ICE officers that he had recently undergone surgery and was still recovering. This did not deter ICE from detaining him and promptly moving him to Moshannon Valley Processing Center, where he struggled to get adequate medical care. His detention, which lasted months, resulted in his pregnant spouse and child losing their stable home due to the loss of his income and support. His wife had

3

pregnancy complications and struggled to care for their child who was diagnosed with a disability while he was in custody. Though our client was ultimately released on a habeas petition, he continues to suffer the trauma of detention on a near daily basis.

13. Due to this uptick in detentions, our program started a *pro bono* habeas project to help people who are being detained. Since the middle of 2025 to June 17, 2026, our program has filed over 45 habeas petitions in federal district courts across Pennsylvania for clients who we re-arrested and re-detained at ICE check-ins or in other routine encounters with ICE. In none of these 45 cases has ICE said that the reason they re-detained our clients was due to a material change in their circumstances.

14. Because most of the habeas decisions by the district courts focus on the statutory and due process claims about whether 8 U.S.C. § 1225(b), which is a mandatory detention statute, or 8 U.S.C. § 1226(a), which allows for a bond hearing, district courts in Pennsylvania are generally not reaching the re-detention claims we include in the petitions. Still, some court decisions to discuss how our clients were re-detained despite no material change in their circumstances since their release. Below are 18 examples where the court discusses how our clients were re-detained despite no material change in their circumstances:

- Order at 1 n.1, *Rosario Hernandez v. Jamison*, Case No. 2:26-CV-02306 (E.D. Pa. Apr. 15, 2026) (describing how, after entering the U.S., petitioner was detained by immigration officials, released, complied with all his supervision requirements, including attending his check-ins and court hearings, and applied for asylum and obtained TPS but was re-detained "without [] prior notice or the opportunity to contest his detention")

- Order, at 1 n.1, *Montero Alcantara v. Jamison,* Case No. 2:26-cv-2226 (E.D. Pa. Apr. 9, 2026) (describing how, since the petitioner's initial release by immigration officials in 2024, he has complied with all requirements, including going to check-in appointments and applying for asylum but was re-detained at an ICE check-in).

- Order at 4, *Arias Mata v. Jamison*, 2:26-cv-02363 (E.D. Pa. April 15, 2026) (discussing how the petitioner had "been complying with reporting requirements since 2023 since the Department of Homeland Security released him on his own recognizance and detained by Immigration and Enforcement on April 10, 2026 when he appeared for a regularly scheduled check-in").

- Order at 1 n.1, *Muller Kinsman v. Jamison*, 2:26-cv-02493 (E.D. Pa. April 22, 2026) (describing how petitioner entered in 2022 and was released by immigration officials "on the condition that he attend routine check-ins" which he had done and that he was re-detained at an ICE check-in on April 13, 2026).

- Order at 2 n.1, *Rodriguez Suarez v. Jamison*, 2:26-cv-02489 (E.D. Pa. April 23, 2026) (discussing how the petitioner was detained by immigration officials at the border in 2023 and was released on humanitarian parole and that since then he attended "all

scheduled hearings and check-ins with Immigration and Customs Enforcement (ICE)")
(citation omitted).

- Order at 2 n.1, *Garcia-Mendoza v. Jamison*, 2:26-cv-02680 (E.D. Pa. Apr. 24, 2026)
  (describing how petitioner, who was detained by immigration officials near the border
  in 2022 and released has since complied with the terms of his release, attending his
  check-ins and filing for asylum, but he was re-detained at an ICE check-in).

- Order at 2 n.1, *Campos Sanjinez v. Jamison*, 2:26-cv-02943 (E.D. Pa. May 5, 2026)
  (describing how petitioner, who was detained near the border in 2022 before being
  released, built a life in the U.S., applied for asylum and a work permit, worked two jobs
  to support his family and himself, while acting as the "primary caretaker for his sister
  who suffers from serious medical conditions," and that he "complied with all conditions
  of his immigration process and release and check ins with ICE" and was nevertheless
  re-detained at an ISAP check-in)

- Order at 2 n.1, *Aghayev v. Jamison*, 2:26-cv-03087 (E.D. Pa. May 8, 2026) (describing
  how the petitioner entered the U.S. in 2022, was detained and then released from
  detention after three weeks and that, since then, he has "obtained a work permit,"
  "complied with all the conditions of his removal proceedings and immigration release
  and has submitted an asylum application," but was re-detained at an ICE check-in on
  May 4, 2026).

- Order at 1 n.2, *Faria Jimenez v. Jamison*, 2:26-cv-03083 (E.D. Pa. May 12, 2026)
  (discussing how petitioner entered in 2024, that it is uncontested that he complied with
  the terms of his release and removal proceedings, and that there are no allegations he
  is a public safety or flight risk, because "[h]is record of compliance with his release
  conditions speaks for itself").

- Order at 1 n.1, *Montenegro-Zelaya v. Jamison*, 2:26-cv-3185 (E.D. Pa. May 14, 2026)
  (describing how petitioner entered the U.S. in 2022 and after he was released by
  immigration officials from detention, he followed all his conditions of release, applied
  for asylum, and attended his biometrics appointment, but was re-detained in May 2026
  at an ICE check-in).

- Order at 2 ¶ 6, *Rodionov v. Jamison*, 2:26-cv-3078 (E.D. Pa. May 14, 2026) ("Mr.
  Rodionov has complied with all conditions of his removal proceedings and
  immigration release, attending each hearing and Immigration and Customs
  Enforcement (ICE) check-in.") (citation omitted).

- Order at 1–2 n.2, *Zhang v. Jamison*, 2:26-cv-03158 (E.D. Pa. May 14, 2026)
  (discussing how petitioner was released on his own recognizance in 2024 and that since
  that time has complied with requirements and was re-detained at an ICE check-in).

- Order at 2 n. 1, *Gomez-Gonzalez v. Jamison,* 2:26-cv-03190 (E.D. Pa. May 13, 2026) (discussing how petitioner, who was re-detained at an ICE check-in, had fully complied with the terms of his release, "including attending hearings and regular check-ins" and that he had "received work authorization, has worked as a machine operator at a paper company for the past two years, [and] previously worked at a glass recycling plant").

- Order at 2 n. 1, *Dubon Manueles v. Jaimison*, 2:26-cv-3233 (E.D. Pa. May 14, 2026) ("He has complied with all conditions of his removal proceedings and immigration release. He has not had any encounters with the criminal legal system since arriving in the United States.") (citation omitted)

- Order at 2 n. 1, *Karaketov v. Jamison,* 2:26-cv-03199 (E.D. Pa. May 15, 2026) ("He submitted an asylum application, and attended each hearing and Immigration and Customs Enforcement ("ICE") check in. Karaketov has never been arrested, charged, or convicted in connection with a crime.") (citation omitted)

- Memorandum at 1, *Fermenar-Mast v. Jamison*, 2:26-cv-3219 (E.D. Pa. May 15, 2026) (describing how petitioner had been detained briefly at the border in 2022, was released, and since then has complied with the terms of his release, including attending his ICE check-ins, which is where ICE re-detained him).

- Order at 1 n. 1, *Sinisterra Solis v. Jamison*, 2:26-cv-03192 (E.D. Pa. May 18, 2026) (discussing how petitioner was released by DHS in 2022 and that since then he has complied with his terms of his release and removal proceedings, but that despite that, he was re-detained at an ISAP check-in).

- Order ¶ 1-4, *Solano-De La Cruz v. Jamison*, 2:26-cv-03106 (May 19, 2026) (discussing how petitioner was detained near the border in 2022 and released, and, since then, has complied with the terms of his release, including ICE check-ins and applying for asylum, but was re-detained at an ICE check-in).

15. While our program has provided much needed *pro bono* representation, we know we are not reaching everyone who is being subject to this re-detention policy. ICE frequently moves the people they detain around, often very quickly. It is difficult for people in ICE detention to quickly find and connect with legal help and because ICE is re-detaining people without any notice to them, some individuals, like people who are pro se or otherwise unaware of this new policy, are left without legal support after being subject to re-detention.

16. The Philadelphia Field Office's abandonment of their previous policy to not re-detain people absent a material change in circumstances has impacted how I run our program. Our habeas program has been a necessary addition to our work, but it takes significant resources. Federal habeas litigation moves quickly and it requires that I allocate staff time accordingly. The new policy also impacts how we advise our clients and the work we have to do ahead of each appointment. Before this policy change, I felt confident that clients who had no material change in their circumstances and who were still in proceedings (or had an application before USCIS) would

6

not be re-detained by ICE. I had never heard or seen that happening without some material change in their circumstances. Even then, ICE previously conducted some individualized assessment to determine whether that change made the person a danger or flight risk. Since June 2025, I have advised clients and members of my team to advise clients that that they could be re-detained at a check-in despite following all the requirements. This also means we have to be ready to file a federal habeas petition for our clients if they are re-detained at an ICE check-in, despite no material change in their circumstances. Before June 2025, we filed only a handful of habeas petitions per year. Now, we file at least one habeas petition daily.

17. These re-arrests and re-detentions make absolutely no sense. The people they are re-arresting are people, like our clients, who have been going to their scheduled ICE and ISAP appointments. Our clients are committed to pursuing immigration relief and are doing their best to follow all the rules they have been asked to follow. Check-in appointments means they have to take off work, arrange for childcare, and sometimes travel long distances just to get to the appointment. When they are detained unexpectedly, they leave behind children with no one to pick them up from school, cars stranded on the street because they are arrested with their keys, and jobs that support their families and contribute to our economy.

18. The impact of this change has been devastating for our clients. They live in fear of being detained despite following all the rules and pursuing applications for relief that would permit them to remain in the United States. For our program, it has required us to have to advise clients that not only can they be subject to re-detention, but that we are unlikely to be successful in *preventing* the re-detention and we will be forced to seek relief through a federal court via a habeas petition. Despite this risk, our clients insist on complying with the process. Our clients want to follow the rules and do so even though they know that they may be giving up their liberty because of the government's unlawful conduct.

19. While our clients choose to continue to go to their check-ins, I am aware, based on conversations with other attorneys and community members, that there are some individuals who have chosen not to attend their ICE check-ins. I understand this is because they are terrified that if they attend an ICE check-in, they will be detained.

20. These detentions have also resulted in the unnecessary separation of parents from their children, partners from each other, and the lost employment and financial stability to families and communities. Our clients are asylum applicants who have sought legal work authorization—applications for work permits that were approved by the government and which they used to contribute to society and their families. They were given no justification or explanation for their detention. It is also incredibly traumatic for people who have been persecuted in their home countries to be arbitrarily detained. Our clients believe and trust in the system in the U.S. to not be like the countries from which they came, where arbitrary and cruel actions by the government result in significant rights violations (and worse). It is shocking to our clients to be thrust back into detention despite doing all that the U.S. government had asked of them when they were released, like complying with any check-in requirements and attending their immigration court hearings.

I declare under penalty of perjury that the foregoing is true and correct, and that this declaration was executed in Philadelphia, Pennsylvania, on June 17, 2026.

Lilah R. Thompson
Chief of Immigration, Community Defense Unit
Defender Association of Philadelphia

8